Peelle, J.j
delivered the opinion of the court:
This is an action on a contract entered into by and between the claimant and the defendants on the 19th day of March, 1887, whereby the claimant agreed to “furnish, deliver, and deposit around the base of the Washington Monument, in the city of Washington, District of Columbia, 250,000 cubic yards of earth filling, more or less, for the sum of 39 cents per cubic yard, to be paid to the said party of the second part in lawful money of the United States, said filling to extend over the pond just north of said Monument.”
The specifications show that a topographical map had been made, “showing the horizontals of the surface for differences of level of 6 and 12 inches,” and that such map would be “used in determining the amount of filling deposited by the contractor by calculations of the contents of the masses deposited upon the present existing surface,” and that such calculations should be made “under the direction of the officer in charge, and the quantities determined shall be the quantities to be paid for by the United States.”
The contract further provided that “all material furnished and work done under the contract shall, before being accepted, be subjected to a rigid inspection by an inspector appointed on the part of the Government, and such as do not conform to the specifications set forth in this contract shall be rejected.”
“The decision of the engineer officer in charge as to the quality and quantity shall be final.”
The work was commenced and completed within the time and in the manner provided in the contract.
During the progress of the work, which extended over a period of eighteen months, partial estimates were made from time to time, upon which payments were made, and when the work was finished a final measurement was made as for embankment work, fixing the quantity of earth filling deposited at 224,572.3 cubic yards, without any allowance for shrinkage.
Upon the basis of such final measurement the claimant was *360 paid, be reserving at the time tbe right to claim, a proper allowance for shrinkage.
The claimant contends that by the terms of the contract he was to “furnish, deliver, and deposit” 250,000 cubic yards of earth filling, more or less, and that the contract being- silent on the subject, he is entitled under the general custom, well known and prevailing at the time, to an allowance for shrinkage in the measurement of the earth deposited.
The defendants contend that the topographical map “ showing the horizontals of the surface for differences of level 6 and 12 inches over the area to be filled in” was to be “used in making calculations of the contents of the masses deposited upon the surface so marked.”
And that the bidders, being required to state what they would “put the filling in for,” show that the undertaking was “to make an embankment of earth,” and that in determining the amount of work done the measurement should be of embankment and not of loose earth excavated, hauled to, and placed in the embankment, and therefore the terms of the contract exclude usage and custom in such measurement, even if applicable to Government contracts.
The question, narrowed down, as we understand it, therefore is that if the contract is silent on the subject of an allowance for shrinkage — and the general custom then prevailing with reference thereto is applicable to contracts with the Government — the claimant is entitled to recover; otherwise not.
Are contracts made with the United States controlled by the same general law that controls contracts between individuals'?
Of course, where the general law applicable to contracts has been modified by statute, as by the Act of June 2, 1862 (12 Stat. L., 411), contracts with the Government must be made in conformity therewith, as was held in the case of the United States v. Clark (95 U. S., 539-542), which was followed by this court in the Calvary Cathedral Case (29 C. Cls. R., 269-285).
But this act goes only to the manner of the execution of contracts and the mode of preserving the same; and the purpose doubtless was for the information and guidance of thé accounting officers in the settlement of accounts.
The law, as we understand it, was stated by Hamilton in these words: “When a Government enters into a contract with an individual it deposes, as to the matter of the contract, *361 its constitutional authority and exchanges the character of a legislator for that of a moral agent with the same rights and obligations as an individual.” (3 Hamilton’s Works, p. 518.)
The general principle there stated ivas adhered to in the case of the United States v. Bank of the Metropolis (15 Peters, 377-392), where the Postmaster-General had accepted a draft, the court say, “When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibility of individuals who are parties to such instruments. We know of no difference, except that the United States can not be sued.”
Such was the holding of this court, in effect, in the Deming Case (1 C. Cls. R., 191, cited with approval in the Wilson Case (11 C. Cls. R., 520) and the Southern Pacific Case (28 C. Cls. R., 77-105.)
And, except as stated, we are not aware of any authority to the contrary and none have been cited.
Nor are we aware of any statute or judicial decision which excepts known usage or custom from contracts made with the Government, not that usage is incorporated into such contracts when inconsistent with their terms, but, as was said in the case of Thompson v. Riggs (5 Wall., 663-679), “Customary rights and incidents universally attaching to the subject-matter of the contract in the place where it was made are impliedly annexed to the language and terms of the contract, unless the custom is particularly and expressly excluded.” (See also Smoot Case, 8 C. Cls. R., 96; affirmed, 15 Wall., 36.)
And this we understand to be the general doctrine on the subject.
In speaking of a contract with the Government in the case of Robinson v. The United States (13 Wall., 363-366), it was said: “Parties who contract on a subject-matter concerning which known usage prevails by implication incorporate them in their agreement, if nothing is said to the contrary.” This case with others are cited with approval in the case of Grace v. American Central Insurance Company (109 U. S., 278-283).
Here the general rule applicable to contracts as between individuals, in respect to known usage, is announced as applicable to contracts made with the Government; and the defendants, through their officers so authorized to contract, are presumed to have had knowledge thereof. (Chateaugay Iron Company v. Blake, 144 U. S., 486.)
*362 So, applying the general rules referred to. we must hold (1) that a contract made with the Government, unless in conflict with some statute, is controlled by the same general law that controls as between individuals; (2) that if at the time of the execution of such contract there exists a well-known general custom such custom is by implication incorporated into the agreement, “if nothing is said to the contrary.”
The findings in the present case show that “ at the time of the execution of the contract, * * * and long prior thereto, there existed a general custom, well known, i. e., that when the contract is silent on the subject an allowance for shrinkage is made to the contractor in the measurement of an embankment of the magnitude of the work covered by the claimant’s contract herein.”
We will therefore consider the question as to whether or not the contract, including the advertisement and specifications incorporated therein, is silent on the subject of an allowance for shrinkage, or whether the language of the contract excludes such usage or custom.
The defendants’ contention is that the claimant’s undertaking was “ to make an embankment of earth and an agreement that' in determining the amount of work done the measurements should be of embankment and not of loose earth excavated, hauled to, and placed in the embankment,” and that therefore and thereby usage is excluded from the contract, and in support of this contention they rely upon the language of the specifications:

“Specifications for earth filling around the hose of the Washington Monument.

u The filling required is for the extension of the earthen terrace now surrounding the base of the Monument; which extension is to be carried outward in every direction and by a gradual slope of its surface down to the surrounding grounds. It will also extend over the pond just north of the Monument.
“The filling is to be good, sound earth, consisting of clay, sand, loam, or all three combined. ' No refuse material, such as street sweepings, offal, ashes, garbage, or vegetable or animal organic matter will be allowed in it.
“For the present the filling will be confined to the west and northern sides of the Monument, and including the said pond, but the contractor will be guided and directed in the prosecution of his work by the officer in charge, whose orders with reference to the filling must be strictly observed.
*363 “An accurate topographical map of tbe grounds surrounding the terrace has been made, showing the horizontals of the surface for differences of level of six and twelve inches, which map can be seen in the office of the Washington Monument, where it will be filed permanently. This map will be used in determining the amount of filling deposited by the contractor by calculations of the contents of the masses deposited upon the present existing surfaces. These calculations shall be made in the office of the Washington Monument under the direction of the officer in charge, and the quantities determined shall be the quantities to be paid for by the United States.
“ The quantity of filling expected to be put in under this contract is about 125,000 cubic yards, subject to an increase of one hundred per centum (100 %) at the option of the officer in charge, but no contract or contracts will be made for a sum exceeding the amount appropriated by Congress.
“ Bidders will state distinctly—
“First. The price per cubic yard they will put the filling-in for.
“ Second. The number of cubic yards they can supply.
“ Third. The time they will consume in putting in the amount of earth they will furnish.
“ Fourth. The exact place or places from which they propose to procure the filling.
“ Fifth. The route or routes by which they propose to transport the material and the means of transportation to be employed. Each bid must be complete in every particular, positive and unconditional.”
Under these specifications it was doubtless intended that different persons might bid to furnish different amounts, and as matter of fact divers persons did bid to furnish different amounts, as set forth in the findings; so that if contracts had been made with two or more persons to furnish and deliver the amounts bid by them respectively, and perhaps at different prices depending upon the distance of the haul, the quantities so furnished by each could not have been ascertained by measuring the embankment when the work was finished, but each would have been assigned a separate dumping place, and then in conformity with the specifications, in the use of the map, the amount of filling furnished by each would have been determined “ by calculations of the contents of the masses deposited upon the present existing surfaces.”
Under the language there used, this course, it seems to us, would necessarily have followed had there been contracts with two or more persons to furnish the material required for the work; and when this is considered in connection with the *364 language used in tbe contract proper, i. e., that tbe claimant was to “ furnish, deliver, and deposit around tbe base of tbe Washington Monument * # * 250,000 cubic yards of eartb filling, more or less, for tbe sum of 39 cents per cubic yard,” tbe intention of tbe defendants officers thus authorized to contract is not difficult to ascertain.
Tbe specifications, wbicb according to tbe advertisement were submitted to tbe bidders for tbeir information, show that tbe topographical map therein referred to had been made at the time of receiving the bids, yet the quantity of earth filling-had not then been determined upon, but, as stated in the specifications, “the quantity of filling expected to be put in under this contract is about 125,000 cubic yards, subject to an increase of 100 per centum at the option of the officer in charge, but no contract or contracts will be made for a sum exceeding the. amount appropriated by Congress.”
With this map “showing the horizontals of the surface for differences of level of 6 and 12 inches,” the defendants could have reckoned or estimated the probable amount of earth filling necessary at a given or fixed height for the ultimate contour or surface of the terrace.
And if the contract had obligated the claimant to furnish all tbe material and make 250,000 cubic yards of embankment tbe case would then come within the opinion of the court in Clark's Case (6 Wall., 543-547) concerning the construction or building of an embankment on dry laud.
But the claimant’s contract was “to furnish, deliver, and deposit around the base of the Washington Monument * * * 250,000 cubic yards of earth filling more or less,” for which he was to be paid “39 cents per cubic yard.” Not 39 cents per cubic yard of embankment built, but 39 cents per cubic yard for the earth filling furnished, delivered, and deposited.
While the quantity of earth filling so dejmsited was to be determined “by calculations of the contents of the masses deposited upon the present existing surfaces,” shown by the map, the manner of so ascertaining the quantity can not be construed to constitute an agreement to build 250,000 cubic yards of embankment.more or less.
If it were so construed there would be some conflict between the specifications and the contract proper, for the consideration of 39 cents per cubic yard clearly has reference to the *365 quantity furnished, delivered, and deposited, and not to the cubic contents of an embankment.
When the contract was entered into there existed the general custom set forth in the findings, and there being nothing-in the contract expressly excluding such custom the same was incorporated therein, and this being so it follows that the action of the engineer officer in charge refusing to make an allowance for shrinkage was erroneous.
The provision in the contract that “the decision of the engineer officer in charge as to the quality and quantity shall be final,” refers only to his measurement in point of fact, and not to the principle of law on which it is made, as it is the province of the court to determine the law of the contract. (King Iron Bridge v. St. Louis, 43 Fed. R., 768; cite with' approval, Lewis’s Case, 49 Fed. R., 708-710.)
The work extended over a period of eighteen months, though completed within the time specified in the contract; and during the progress of the work the earth deposited was much driven over by the teams, so that at the time of the final measurement the shrinkage was about 10 per cent of the quantity ascertained by the engineer officer in charge, or 22,457 cubic yards, for which the claimant is entitled to 39 cents per cubic yard, amounting to $8,758.23, for which amount judgment will be rendered.