Booth, J.,
delivered the opinion of the court:
This is a suit under a special jurisdictional statute. The claim is one for damages growing out of the alleged misuse of certain horses, mules, and wagons employed by the military authorities of the Government in February, 1862. During the progress of the civil war it became necessary to reenforce the garrison in charge of the federal supply depot at Fort Union, N. Mex. The most available troops for the purpose were then stationed near Denver, Colo., some 275 miles distant. Pursuant to a military order issued by Major-General ITunter, then in command of the Department of Kansas, directed to the governor of Colorado, the First Regiment Colorado Volunteer Infantry was immediately dispatched to Fort Union. The claimant’s decedent was engaged by verbal contract, made by lawful authority, to transport the camp equipage and public-stores of said regiment from Denver, Colo., to Fort Union; The contract called for, and the claimant furnished for the 'purpose, a transportation train of 32 teams, of four mules, or horses and mules, each, with suitable wagon and driver. The expedition started from Denver on February 22, 1862, and. notwithstanding the depth of snow and state of the weather, proceeded with ordinary dispatch until Pueblo, Colo., was reached.
At this point news was received that the Union forces had been defeated at Val verde, N. Mex., and the enemy advancing up the Rio Grande, with ultimate intention of marching upon Fort Uni°n> the only federal supply depot in this vicinity. This alarming intelligence imperatively demanded immediate haste upon the part of the colonel in command of the Colorado regiment, and forced and unusual marches were immediately ordered, and such celerity of movement obtained that the distance from Pueblo to Fort Union'was covered in eight days, a portion of the way being-over the Raton Mountains. In consequence of such strenuous service the wagon train of claimant’s decedent suffered severe injury, many of the horses and mules employed either *216 died or were abandoned • en route, the wagons and harness were severely injured, and the horses, wagons, and harness were returned to the claimant considerably damaged. The contract placed the transportation train in the custody of the military authorities, forage was to be furnished by the latter, and it was under the supervision of Thomas Pollock, wagon master and agent of Capt. S. IT. Moer, Acting Assistant Quartermaster-General, U. S. Army. The service rendered, and subsequently paid for, extended from February 22, 1862, until March 28, 1862. A board of survey, ordered by the commanding officer of the regiment, inquired into the condition of this stock when it reached Fort Union, and its findings are set forth in detail in Finding X.
The special jurisdictional statute (32 Stat., 243) provides as follows:
“ That full jurisdiction is hereby conferred upon the Court of Claims to hear and determine the claim of the personal representatives of William Kiskadden, deceased, against the United States for twenty-one thousand dollars, growing out of the alleged destruction of and damage to one hundred and twenty-eight head of horses and mule.s, thirty-two wagons, and sixty-four sets of harness belonging to the said William Kiskadden, resulting from the use of said teams under a contract made by the Government with the said William Kis-kadden to transport the First Regiment of. Colorado Volunteers from the city of Denver, Colorado Territory, to Fort Union, Territory of New Mexico, between the twenty-second day of February, eighteen hundred and sixty-two, and the twenty-eighth day of March, eighteen hundred and sixty-two; notwithstanding the lapse of time since such alleged destruction and damage. That upon petition being filed in said court, within six months from the passage of this act, by the personal representatives of said William Kiskadden, the court is authorized and directed to determine the merits of said claim, and to render judgment for the sum, if any, found due the personal representatives of said William Kis-kadden because of such destruction and damage to said horses, mules, wagons, and harness, with right to either party to appeal to the United States Supreme Court; and in the trial of said cause the affidavits on file in the War Department shall be received as competent evidence, and the finding of a board of survey (supervisors) convened at Camp Slough March fourteenth, eighteen hundred and sixty-two, that thirty-six of said animals, worn out and broken down from *217 severe driving and want of forage, were abandoned before reaching Fort Union, if such finding be shown, shall be deemed and taken to be prima facie proof of the fact of such abandonment and loss: Provided, That in case judgment shall be rendered against the United States the Secretary of , the Treasury shall be, and he is hereby, authorized and directed to pay the personal representatives of said William Kiskadden whatever sum shall be adjudged by the court to be due out of any money in the Treasury not otherwise appropriated.”
The provisions of the foregoing statute, supplying, as it does, the essential testimony to establish the claim, reserve 'to the defendants a defense predicated wholly upon a detailed discussion of claimant’s testimony and the legal principles applicable thereto. Taking up these defenses in the order presented, it is first urged that the hazards attending the undertaking were fully known to claimant, that the contract wat made with full knowledge of the claimant that he was to accompany a military expedition, and he thereby assumed all the risks incident thereto. It is settled law that “ when a government enters into a contract with an individual it deposes, as to the matter of the contract, its constitutional authority and exchanges the character of a legislator for that of a moral agent with the same rights and obligations as an individual.” (3 Hamilton’s Works, p. 518; Lyons v. United States, 30 C. Cls., 352-361.) The contractor and defendant being mutually obligated under the agreement, the common law rule respecting an ordinary bailment obtained.
While the contractor knew that he was engaging to perform a service in connection with military forces of the Government, still there is nothing in the record to indicate that he had reasonable or just grounds to anticipate the total destruction of his property. There were no hostile forces in this immediate vicinity, he was not put in possession of any military secrets, and it is inconceivable that the contractor would, for the stipulated compensation, subject to misuse and destruction a valuable transportation train ordinarily used by him in private enterprise. It is elementary that the total destruction of personal property under hire to a bailee, *218 by the latter, amounts to a conversion of the same. It is likewise elementary that the proof of injury to or destruction of personal property under hire to a bailee, by the latter, raises a prima facie case of negligence upon the part of the bailee, which it is incumbent upon the latter to overcome by a preponderance of the testimony.
In the case at bar the findings disclose that this military expedition proceeded by ordinary stages until interrupted by the intelligence of federal reverses and a probable danger to the base of Union supplies. The relieving expedition at the time was many miles from its final destination, and the subsequent events set forth in the findings conclusively show that the military necessities of the hour compelled a disregard of rights of property and, to some extent, human life. The ordering of a board of survey to estimate damage and loss to property carried with the regiment is conclusive proof that the forced march was unusual, severe, and attended with much hardship.
It is next contended that the payment of and receipt in full for the compensation agreed on between the parties, without protest, estops the assertion of the present claim. This case differs from the case of Andrews v. United States (16 C. Cls. R., 274). In the Andrews case the damages claimed are incident to and part of the contract itself. The controversy arose out of an alleged failure upon the part of the Government to perform a certain obligation imposed upon it by the express terms of the contract. The court said (p. 275) :
“ But had there been any such delay, the claimant could not demand damages therefor, since he made no complaint at the time; nor did he make any demand or request for a speedier location of the site; nor did he express any objection to the location, except that which had reference to the depth of the water; and that objection was promptly yielded to by the government officers by the selection of another site. On the contrary, he went straight on with the contract work, and, as it turned out, furnished four times the quantity of stone originally estimated for; and was paid the contract price for all that he furnished; and so the transaction was closed without objection on his part.”
It is quite apparent that the rule so stated has no application here. The action here is independent of the contract, *219 an action ex delicto, arising out of the negligence of the defendant in carelessly destroying and injuring claimant’s property. Certainly it can not be held that the payment of an express amount due under a contract, about which there is no dispute, although receipted for in full, estops the assertion of claim for damages arising independent of the same. It can not be considered an accord and satisfaction; for no new contract was substituted for the old one; the old one was executed and nothing remained except to pay the consideration agreed upon.
A receipt, though purporting upon its face to be conclusive, is subject to explanation and contradiction as between the parties thereto, in absence of intervening rights. What consideration passed to support the relinquishment by the claimant to the defendant of his cause of action ? There was no compromise, thé claimant received his due under the agreement, and it is clearly indisputable that the creditor has a legal right to payment of debts due him, in strict accord with the obligation entered into, in whole or in part, and when he so receives it, he receives only that to which he is entitled under the law, and the transaction can not be so construed as to support a promise not to pursue his remedy for injuries occasioned independent of the contract. There is no consideration to support such a promise. (Page on Contracts, 468, and authorities there cited; Murdock v. District of Columbia, 22 C. Cls. R., 464.) Receipts given and settlements made in contradiction of the above rule are the results of controversies compromised by the parties thereto.
The contract was one of hire and not of service. The military authorities took immediate possession and control of claimant’s property, which was under the direction of the commanding officer of the regiment, and was returned to the owner by the wagon master of the regiment. The defendant so construed the contract and paid accordingly, as the vouchers indicate.
The jurisdictional statute makes the findings of the board of survey, convened March 14, 1862, prima facie proof of the facts recited therein, and to this extent fixes, as per Finding X, the value of the horses and mules lost or abandoned *220 at $5,702. Some animals were lost or abandoned on the return journey, just bow many it is impossible to determine.
The record sustains a total damage to property, in addition to ordinary wear and tear, of $9,702, for which amount judgment will be awarded the claimant.
Howery, J., was absent and took no part in this decision.