*207 Opinion
Madden, Judge,
delivered the opinion of the Court:
The plaintiff is a partnership engaged in the construction business. On March 14, 1938, it made a contract with the United States, which acted through the Bureau of Reclamation of the Department of the Interior, by which it agreed to construct the Vallecito Dam on the Pine River in southern Colorado. It was to be paid,unit prices for most items of the work, and the estimated total price of the project was $2,115,870.
The site of the dam was about 7,550 feet above sea level. It was to be an earth-filled dam about 4,000 feet long at the crest, 600 feet wide at the base, and with a maximum height of about 125 feet. The embankment was to consist of three zones. Zone 1, the upstream zone, and Zone 3, the downstream zone, were to be constructed of pervious and semi-pervious materials, i. e. rock, gravel and cobble stones; Zone 2, in the center, was to contain only impervious material, i. e. earth and only such stones as could be effectively sealed in the earth, leaving no voids. The face of the upstream slope was to be covered with three feet of large stones, riprap. The downstream slope of the dam was to be covered with cobble stones, with a cobble-sluiced gravel fill at the downstream toe.
In constructing the dam a deep trench, called a cut-off trench, was to be dug under the place where Zone 2 of the dam was to be located, which trench was to be tamped full of impervious material to prevent the seepage of water under *208 Zone 2. At the ends of this trench, at each abutment of the dam, was to be built a concrete cut-off wall, placed on bedrock. The earth, gravel, and rock for the embankment were to be obtained from the required excavation and from borrow pits, except that the riprap stones were to be obtained from a designated rock quarry.
The normal flow of water out of the reservoir created by the dam was to be through a twin-barrelled concrete conduit through the embankment at the lower part of the right abutment. A control house for the control of the gates of this conduit was to be built on the crest of the dam. The flow through the conduit was to be emptied into an open channel, called the outlet channel, which was to be lined with concrete at the bottom. The outlet channel was to empty, in turn, into the spillway channel, at a point about 200 feet downstream from the dam. The spillway channel was to start from a point at the top of the dam, near the right abutment, and to carry the overflow of the reservoir in flood times. It was also to be lined with concrete on the bottom and was to extend about 2,800 feet downstream where it was to empty into the stilling basin, which in turn would overflow into the river. Gates to control the flow into the spillway channel were to be placed at its upper end.
The contract completion date was December 18,1941. The work was in fact completed in October 1941. Although relations between the representatives of the plaintiff and of the Government were cordial and cooperative during the performance of the contract, differences of opinion as to what was required of the parties by the contract resulted in the filing by the plaintiff with the contracting officer of a large number of claims. Some 43 claims were excepted from the otherwise final settlement made for the work. The contracting officer thereafter, on December 29, 1942, made his decision on the claims. The plaintiff appealed to the head of the department, the Secretary of the Interior, from the parts of the contracting officer’s decision which were adverse. The Secretary of the Interior affirmed the contracting officer’s decision in all respects.
■ The plaintiff, in its petition in this suit, used the same numbers for its claims which it had used in the proceedings *209 in the department. It did not, however, include some of the claims in this suit which it had urged upon the department. Some other claims which it included in its petition it has now abandoned, since receiving our Commissioner’s report. The numbering of the claims in our findings and opinion is, therefore, not consecutive, there being some numbers missing in the sequence.
As to certain of the claims, the findings of the contracting officer were favorable to the plaintiff and the plaintiff is satisfied with the amounts awarded. Those amounts have not been paid, and the plaintiff is entitled to a judgment for those amounts. Those claims are as follows: No. 5, $2,450; No. 13, $4,125; No. 18, $466.40; and No. 41, $500.
As to the contested claims, the Government urges that the departmental action was final and binding upon the plaintiff, under the terms of its contract. The pertinent provisions of the contract are Article 15 of the contract, relating to Disputes, and Paragraph 14 of the specifications, relating to Protests. We quote these provisions in a footnote.[1] As. to most of the claims, we have found that the plaintiff’s, protests were oral. The Government seems to urge that, since they were not written, they were ineffective. But Paragraph 14 does not say that a contractor’s protests and requests for written instructions must be in writing, and we do not *210 construe it to so require. The contracting officer did not, as Paragraph 14 provides, respond to the plaintiff’s protests •and requests for written instructions by furnishing such instructions. He refused to furnish them, saying that.the contract required what he was demanding of the plaintiff. The plaintiff performed the work demanded, and did not, within 10 days, file written protests with the contracting officer. We think that it was not required to do so and lost no rights by not doing so. The Government was in default, so far as the specified procedural steps were concerned, and has no right to complain of the plaintiff’s default.
Paragraph 14 of the specifications provides no finality of departmental decision in circumstances such as we have here. Indeed, finality is almost expressly excluded by the provision that the contracting officer’s decision shall be final except where protests are made and followed up in the specified manner. Since the plaintiff did protest, and the Government failed to respond with written instructions, the plaintiff is entitled to whatever rights it would have had if its protests had been followed by the rest of the specified procedure. Its rights, then, were not determined by any departmental decision agreed to by its accepting paragraph 14 of the specifications.
As we have said, the plaintiff did file its claims with the contracting officer and appealed that officer’s adverse decisions to the head of the department, who affirmed the decisions. Those steps were the steps described in Article 15 of the contract, which we have quoted. Were they taken because Article 15 of the contract was applicable, or were they taken only as a hopeful avenue to possible relief ? In the case of United States v. Moorman, 338 U. S. 457, the Supreme Court held that paragraph 2-16 of the specifications there involved stood on its own feet, and that this court’s decision making it subject to Article 15 of the contract, 113 C. Cls. 115 at 179, was erroneous. Paragraph 2-16 in the Moorman case covered the same factual situations as paragraph 14 in the instant case. It said:
If the contractor considers any work demanded of him to be outside the requirements of the contract, or if *211 lie considers any action or ruling of the contracting officer or of the inspectors to be unfair, the contractor shall etc.
But it went on to provide for a decision by the contracting officer and an appeal, if desired, to the head of the department, whose decision should be final.
The Supreme Court said in the Moorman case that the parties had a reason for inserting paragraph 2-16 in the specifications, the reason being their desire to escape from the “oft repeated conclusion” of this court that questions of “interpretation” of contracts are not questions of fact. Paragraph 2-16 on its face made all questions covered by it subject to final departmental decision, whether they were questions of fact or law. The provision in Article 15 of the contract for final departmental decisions only on questions of fact was held to place no restriction upon the breadth of paragraph 2-16 of the specifications.
If, in the instant case, the provisions of paragraph 14 of the specifications stand on their own feet, and remove the factual situations covered by the paragraph from the coverage of Article 15 of the contract, then there is, in the factual situation which we have before us, no provision for any appeal to the head of the department, and no provision for finality of the decision of anyone. Indeed there is no provision that the contracting officer shall make any decision, after he has received the written protest of the contractor, “stating clearly and in detail the basis of his objections”. If that is all there is to the contract, of course the plaintiff has a right to assert in court that the contract was breached by the government since the contract gives him no other relief and provides for no departmental decision, final or otherwise.
We would suppose that paragraph 14 was a piece of careless writing by some representative of the Government and that the writer probably had a vague intention that the gaps left in his writing should be filled in by the general provisions of Article 15. We might, in violation of at least two canons of interpretation, (1) that an ambiguity in a contract should be resolved against the party who wrote the contract *212 and (2) that the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language, Mercantile Trust Co. v. Hensey, 205 U. S. 298, 309, cited with approval in the Moorman case, supra, relieve the Government of the burden of its careless drafting, but in view of the decision in the Moormam, case, supra, we leave the question undecided. For reasons which we will now state, we have concluded that, even if we apply the provisions of Article 15 to the claims before us, the plaintiff is still entitled to be heard upon them.
Article 15, which we have quoted, supra, provides for •finality of departmental decision only with regard to “all disputes concerning questions of fact arising under this contract.”
In the Moorman case, supra, the Government apparently urged that the question there presented of interpretation of the language of the contract was a question of fact and that, therefore, even if Article 15 was applicable, the departmental decision was final. The court said:
But while there is much to be said for the argument that the “interpretation” here presents a question of fact, we need not consider that argument. For a conclusion that the question here is one of law cannot remove the controversy from the ambit of par. 2-16 of the specifications.
In view of this observation of the Supreme Court, we have re-examined the doctrine heretofore applied by this court to this problem.
We are, of course, aware that questions of the interpretation of written documents are not, speaking with analytical accuracy, in most cases questions of law in the sense that a lawyer or a judge has the special skill needed to answer them. They may be questions of agriculture, or engineering, or finance, or medicine, or law. In the division of judicial functions between the judge and the lay jury which only by accident would have the requisite skill in a particular case, the judge reserved this function to himself, presumably as being more competent than the jury. And judges and lawyers began to call the questions “questions of law,” as a *213 short way of saying that they should be decided by the judge. This method of expression, though analytically inaccurate was, so far as we know, quite universal. All the courts, including the Supreme Court of the United States, used it, and applied it with serious consequences. Hamilton v. Liverpool, London and Globe Insurance Co., 136 U. S. 242, 255, Bliven, et al. v. New England Screw Co., 23 How. 420, 433; Turner, et al. v. Yates, 16 How. 14, 23. Where appellate courts have had jurisdiction to review questions of law but not questions of fact, they have held that they could review questions as to the interpretation of contracts. See United States v. E. J. Biggs Construction Co., 116 Fed. 2d 768, 770. Similar statements and decisions were early made by this court with reference to the finality of the decisions of a designated officer in problems arising in government contracts. Lyons v. United States, 30 C. Cls. 352, 365; Collins and Farwell v. United States, 34 C. Cls. 294, 332. Other Federal Courts held likewise. Lewis, et al. v. Chicago, S. F. & C. Ry. Co., 49 F. 708, 710, 713; King Iron Bridge & Manufacturing Co. v. City of St. Louis, 43 F. 768. The Government has cited us no authority to the contrary.
In view of the unanimity of statement by courts that questions of the interpretation of written documents were “questions of law” the plaintiff urges that the representatives of the Government, and of contractors, who adopted Standard Form 23 which included Article 15, chose the language there used in the light of the then universal usage of the courts, and hence did not mean to include questions of the interpretation of written contracts within the “questions of fact” which were made subject to final departmental decision. ([This court and other courts dealing with the question have interpreted Article 15 as the plaintiff would have it interpreted. Albina Marine Iron Works, Inc. v. United States, 79 C. Cls. 714, 722; Davis, et al. Trustees v. United States, 82 C. Cls. 334, 346-347; Rust Engineering Co. v. United States, 86 C. Cls. 461, 477; Schmoll, Assignee v. United States, 91 C. Cls. 1, 33; Callahan Construction Co. v. United States, 91 C. Cls. 538, 616-617; Ruff v. United States, 96 C. Cls. 148, 165; B-W Construction Company v. United States, 97 C. Cls. 92, 118-119; John McShain, Inc. v. United States, 97 C. Cls. 281, *214 295; Gerhardt F. Meyne Co. v. United States, 110 C. Cls. 527, 548. Other Federal Courts have given the same interpretation to this standard Government contract provision. General Steel Products Corporation v. United States, 36 F. Supp. 498, 502; Lundstrom v. United States, 53 F. 2d 709, 711. See also Central Nebraska Public Power and Irrigation District v. Tobin Quarries, 157 F. 2d 482, 486.
Of greater significance, perhaps, is the fact that the Government itself, through its Boards of Contract Appeals set up in the departments to act as the authorized representative of the heads of departments to hear and decide appeals by contractors from the decisions of contracting officers, has also interpreted Article 15 of the standard contract as not including, in its expression “disputes concerning questions of fact”, disagreements as to the interpretation of written contracts. Thus these Boards have, at the urging of the Government, dismissed appeals because they involved such questions. Appeal of W. F. Trimble & Son Co., 1 CCF. 47, 48; Appeal of Fred A. M. de Groot, Inc., 1 CCF. 148, 149; Appeal of Central Engineering & Contracting Corporation, 3 CCF. 989, 992; Appeal of Ross Engineering Company, 3 CCF. 1153, 1155.
In the current “Charter for the Armed Services Board of Contract Appeals”, effective May 1, 1949, modified June 30, 1949, in paragraph 4 appears this language:
When an appeal is taken pursuant to a disputes clause in a contract which limits appeals to disputes concerning questions of fact, the board may nevertheless in its discretion hear, consider, and decide all questions of law necessary for the complete adjudication of the issue.
If the Board “in its discretion” chose not to consider and decide the pertinent questions of law it would not, presumably, decide the case, hence resort to a court would seem to be open to the contractor. The draftsmen of the charter were apparently using the expression “questions of law” with the analytically inaccurate but judicially common meaning described above. The Board, acting under the charter, treats questions of the interpretation of contracts as “questions of law” and decides them, or refuses to decide them, in its dis *215 cretion. See Appeal of B. G. Cury Co., ASBCA No. 227, Oct. 27, 1949; Id. ASBCA No. 228, Oct. 27, 1949; Id. ASBCA No. 286, Nov. 21, 1949: Erman Howell Division, Luria Steel and Trading Corporation, ASBCA No. 188, Nov. 29, 1949; Franklin Iron and Metal Co., ASBCA No. 194, Nov. 30, 1949. We think it would be intolerable that this court should refuse to consider claims involving interpretation of contracts, when the departmental board is directed to hear them only “in its discretion.” Is the contractor supposed to have agreed that he may have a departmental ruling only if the departmental board chooses to give him one; that he may find out whether they will give him one only by going to the trouble and expense of preparing the case for the board, but that if they do choose to give him a ruling, it will be final ?
When the Boards have decided questions of interpretation on appeal, they have made it plain that they were doing so, not because the “disputes concerning questions of fact” clause of the contract authorized them to do it, but because the plaintiff had asked for the decision and the head of the department had authorized the board to make it. See Appeal of Robert E. McKee, BCA No. 1617, Jan. 21, 1948; Appeal of S. K. Jones Construction Co., BCA No. 1619, Feb. 6, 1948. See our decision of today in McWilliams Dredging Co. v. United States, No. 48894, for an explanation of why such a decision of the Board does not foreclose the contractor from litigating the question in a court.
We now consider the plaintiff’s claims upon their merits. The findings are long and detailed and the details yrill not be repeated in this opinion.
Claik No. 1.
Findings 23 to 32 relate to this claim. We have concluded that no substantial extra costs were incurred by the plaintiff because of its excavation in Area A, rather than in higher ground, except for the first two days of excavation in that area. The plaintiff has not proved what its extra costs were for those two days, and therefore cannot recover on this claim.
*216 Claim No. 2
Findings 33 to 44 relate to this claim. The plaintiff cannot recover upon this claim. We have found that the material here in question was stockpiled for the plaintiff’s convenience for future use, and was so used when the embankment had been built up to a height convenient for its use.
Claim No. 3
Findings 45 to 50 relate to this claim. Under the terms of the Extra Work Order No. 6, the plaintiff was entitled to be paid the scheduled price of 35 cents per cubic yard for re-handling 1,966 cubic yards of material, a total amount of $688.10, which plaintiff is entitled to recover.
Claim No. 4
Findings 51 to 63 relate to this claim. We have concluded that, as to the excavation below elevation 7,528, the contract did not require the plaintiff to perform this unexpectedly difficult and expensive work for the price named in the schedule. It is entitled to recover its extra costs, amounting to $497.97.
Claims Nos. 6 and 10
Findings 65 to 80 relate to these claims. The Government required the plaintiff to insert tile drains embedded in gravel to keep the trenches dry while they were being filled with impervious material. The plaintiff contends that the much cheaper method of open ditches would havé served that purpose. We are not persuaded that open ditches would have been effective. The plaintiff cannot recover on these claims.
Claims Nos. 7 and 8
Findings 80 to 87 relate to these claims. The tile drains here in question were not provided for in the contract. As they were constructed, they served the plaintiff’s convenience in drying oüt the area for the placement of concrete and for *217 other work, but, as constructed, they also permanently bene-fitted the Government by being left in place as an additional safeguard against upward pressure of ground water against the concrete floor of the outlet channel. The plaintiff may recover $200 upon this claim.
Claim No. 11
Findings 88 to 92 relate to this claim. The work here involved was necessary for the unwatering of the foundation, and the plaintiff was obligated by the contract to do it. It cannot recover for its cost.
Claim No. 17
Findings 97 to 124 relate to this claim. Paragraph 10 of the specifications quoted in Finding 14 provides that when the contractor is ordered to perform extra work not covered by the specifications or included in the schedule, and when no price for the work can be set by agreement, the work shall be paid for at actual necessary cost as determined by the contracting officer, plus 10 percent for superintendence, general expense and profit. The dispute in this case is as to the amount of the actual cost of the work. The contracting officer agreed with the plaintiff as to the hours of labor and rates of pay of the workmen engaged, as to the hours of use of equipment, except in specific instances, and as to the cost of materials used. The disagreement was and is with regard to the allowance to be made for the use of the plaintiff’s equipment in performing the extra work. The contracting officer computed the allowance for the use of the equipment and its operating expense at $145,230.07, and awarded the plaintiff $44,208.45 in addition to the amounts which had been currently paid. The award was rejected and has not been paid to the plaintiff, and in its petition it claims $181,721.10 on this item.
We have found that, using proper accounting methods to determine a proper allowance for the use of the plaintiff’s equipment, its extra costs, in addition to the amount currently paid, were $155,748.44. One error in the contracting *218 officer’s method of accounting was that he took the schedule of rental charges for the use of a contractor’s own equipment, which schedule was promulgated by the Bureau of Reclamation, in effect divided the annual rental specified in the schedule by the number of hours which the machine, could work if it worked every day in the month and every hour of the working day, during the number of months specified in the schedule as being proper working months for the machine in question in the area in question, and used that quotient as the rate per hour for the use of the plaintiff’s machines. It then applied the hourly rate so derived to the actual number of hours which the plaintiff’s machines worked on the job covered by this claim. The hourly rate thus derived was completely unrealistic and unfair. Annual rental rates, such as those promulgated by the Bureau of Reclamation, are not based upon the false assumption that such machines work every hour of every day, with no interruptions on account of weather, necessary minor repairs or for other reasons. These losses of time are not supposed to be at the expense of the owner, when in fact the machine is, at the time, being devoted to the job of the hirer.
An error more costly to the contractor was the contracting officer’s computation of the costs of current repairs and maintenance of the machines. The contracting officer was aware of the plaintiff’s actual costs, incurred during the period, and could have readily computed a proper hourly rate for each machine. But he disregarded the actual costs, presuming that they were excessive and must have included major repairs and general overhauling. There was no substantial evidence to support that view, since the records showed that none of the machines was out of service long enough for such treatment. The contracting officer assigned arbitrary hourly figures for the costs of repairs and maintenance of the machines, and it is hard to tell how he hit upon such figures. For example, he awarded substantially the same hourly rate for a $205 jack hammer that he did for a $20,000 Euclid tractor truck, and, only a few cents more for a $39,000 dragline.
*219 We conclude that the plaintiff did not agree, by signing this contract, to be bound by administrative decisions made in disregard of the practices of trade, of proper accounting methods, and of the known facts as to actual costs. Nor did it agree to be bound by computations based on arbitrarily chosen figures which on their face show that they must be wrong. We conclude that the administrative treatment of this important claim of the plaintiff was arbitrary and capricious. The plaintiff may recover $155,748.44 on this claim.
Claim No. 20
Findings 127 to 143 relate to this claim. The contracting officer decided that the excavation here in question was “stripping,” while the plaintiff claims that it was trench excavation. We have concluded that it did not come within either of these classifications in the specifications, as properly interpreted. It was more nearly comparable to borrow excavation than to either of the other classifications and the plaintiff is entitled to $6,125.49, which includes the $1,279.95 awarded by the contracting officer but rejected by the plaintiff.
Claim No. 27
Findings 144 to 146 relate to this claim. The plaintiff cannot recover. It was paid all that it was entitled to under its contract.
Claim No. 31
Findings 147 to 158 relate to this claim. The contracting officer’s decision that the neat lines, and not the lines to which the plaintiff actually excavated, should be used in measurement for payment was in the circumstances reasonable, and the plaintiff cannot recover on this claim.
Claim No. 33
Findings 159 to 166 relate to this claim. The Government had the right to change the design of the work, as it did here, and the plaintiff was obligated to do the redesigned work at contract rates. It cannot recover on this claim.
*220 Claim No. 34
Findings 167 to 172 relate to this claim. We conclude, rather doubtfully, that the temporary filling of the excavation by the plaintiff, rather than leaving it open to await the change of design which the Government-had the right to make, was not a necessary consequence of the change of design, but was an act done by the plaintiff of its own choice. The plaintiff cannot recover upon this claim.
Claim No. 35
Findings 173 to 179 relate to this claim. The contract provided for additional payment for extra rolling of the material in the embankment, except under certain circumstances. The plaintiff was ordered to do the extra rolling, and expected to be paid for it. When its payment arrived, nothing was included for the extra rolling. The plaintiff requested payment, but payment was refused on the ground that it was not possible, after the rolling had been completed, to verify the yardage involved. The yardage of extra rolling is sufficiently verified and the plaintiff is entitled to $1,500.83 on this claim.
Claim: No. 37
Findings 180 to 186 relate to this claim. We have found that the excavation covered by it has already been paid for. The claim must, therefore, be denied.
Upon the contested claims the plaintiff is entitled to recover $164,760.83, and upon the uncontested ones referred to earlier in this opinion $7,541.40, making a total of $172,302.23.
It is so ordered.
Howell, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.

 Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning question of fact arising under this contract shall he decided hy the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
The cited paragraph of .the specifications is as f oUows:
14. Protests. — If the contractor considers any work demanded of him to be outside the requirements of the contract, or considers any record or ruling of the contracting officer or of the inspectors to be unfair, he shall immediately upon such work being demanded or such record or ruling being made, ask for written instructions or decision, whereupon he shall proceed without delay to ^perform the work or to conform to the record or ruling, and, within 10 days after date of receipt of the written instructions .or decision, he- shall file a written protest with the contracting officer, stating clearly and in detail the basis of his objections. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions, or decisions of the contracting officer shall be final and conclusive. Instructions and/or decisions of the contracting officer contained in letters transmitting drawings to the contractors shall be considered as written instructions or decisions subject to protest or objection© as herein provided.