**WM. A. SMITH CONTRACTING CO., Inc.,**

v.

**UNITED STATES.**

No. 279–59.

United States Court of Claims.
July 19, 1961.

Morgan Hunter, Austin, Tex., for plaintiff; James W. Wilson, and Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, Tex., on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

PER CURIAM.

This case was referred pursuant to Rule 45, 28 U.S.C.A. to W. Ney Evans, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed March 16, 1960. Briefs were filed by both parties, exceptions to the commissioner's findings was filed by the plaintiff, and the case was submitted to the court on oral argument by counsel. Since, after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and its petition will be dismissed.

It is so ordered.

Opinion of Commissioner.

The contract in suit, for the rehabilitation of 24.3 miles of track of The Alaska Railroad, was performed by plaintiff to the satisfaction of the contracting officer. Plaintiff now seeks recovery for breach of the contract by defendant.

All of the evidence in the case was received at a pretrial conference.[1] It consists of (1) the official report of proceedings before the Board of Contract Appeals of the Department of the Interior;[2] (2) the exhibits received by the Board

1. At the pretrial conference the parties stipulated, with the approval of the commissioner, to limit the trial in the first instance to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings. Finding 19(b).

2. The parties stipulated that each of the witnesses whose testimony is contained in the transcript would, if called as a wit-

in that proceeding; and (3) the recommendations of the Board's examiner and the decision of the Board.

Since the contract's disputes clause contained the standard provision according finality to administrative decisions of "any dispute concerning a question of fact," the threshold problem here is whether or not any of plaintiff's disputes with the contracting officer was so predicated as to remove it from the question-of-fact category.[3]

The first of plaintiff's claims relates to the bid item under which the contractor was to "raise, line, and dress track."

The contract required that "ballast to make an average 6″ raise (1,770 cubic yards per mile) will be spread to make two separate track lifts * * *;" and that, "as an over all lift of six (6″) inches is required, the first raise should be approximately four inches (4″) although considerable variation from this rule must be allowed to eliminate sags and humps in the existing grade line."

Plaintiff says that, in preparing its bid, it read these specifications to mean (1) that the track had to be lifted twice, for an overall raise of 6 inches, and (2) that ballast averaging 6 inches had to be placed, but not in two lifts on new ballast. The contracting officer required plaintiff to make two lifts on new ballast.

Since plaintiff had already made one lift, while it was replacing and respacing ties, before the new ballast (to be sup-

plied by the Railroad) was available, plaintiff contends the contracting officer in effect required an overall raise of 9 or 10 inches, in three raises, and that the third raise was extra work for which the contractor should receive an equitable adjustment.

In this connection plaintiff relies on the line of cases typified by Peter Kiewit Sons Co. v. United States,[4] wherein the court said:

"Where the government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted."

The Board of Contract Appeals ruled, in effect, that the specifications were not susceptible of the construction urged by plaintiff.

Was this a dispute concerning a question of fact, within the meaning of the disputes clause?

In Wunderlich et al. v. United States,[5] the court said No, referring to "the unanimity of statement by courts that questions of the interpretation of written documents were 'questions of law' * *."

Wunderlich was reversed.[6] The Supreme Court upheld the finality of the administrative decisions under the disputes clause in the absence of conscious wrongdoing.[7]

The so-called Wunderlich statute followed.[8] Section 2 of the act provided:

ness to testify under oath in this proceeding in the Court of Claims, testify as he did before the Board. Finding 19(c).

3. Although plaintiff alleged in its petition that the administrative decisions were "arbitrary, capricious and/or so grossly erroneous as necessarily to imply bad faith, and * * * not supported by substantial evidence * * *," it has abandoned this position. No request for a finding of this nature was submitted by plaintiff. Moreover, finding 23(a) recites that "none of the findings, conclusions, or decisions of the * * * Board was either arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad

faith, or lacking in support by substantial evidence."

4. 1947, 109 Ct.Cl. 390, 418.

5. 1950, 117 Ct.Cl. 92, 213.

6. United States v. Wunderlich et al., 1951, 342 U.S. 98, 72 S.Ct. 154, 155, 96 L.Ed. 113.

7. Without stating its analysis of the various claims the court observed that: "Although there was some dispute below, the parties now agree that the question decided by the department head was a question of fact."

8. Act of May 11, 1954, 68 Stat. 81, 41 U.S.C. §§ 321, 322.

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

Considering the history of the Wunderlich Act, and the provisions of section 1,[9] the foregoing provisions of section 2 must be deemed to place "question of law" in juxtaposition to "question of fact" within the meaning of the discussion of such juxtaposition in the Wunderlich decision of the Court of Claims.

The Court of Claims opinion in Wunderlich noted that:

" * * * questions of the interpretation of written documents are not, speaking with analytical accuracy, in most cases questions of law in the sense that a lawyer or judge has the special skill needed to answer them. They may be questions of agriculture, or engineering, or finance, or medicine, or law. In the division of judicial functions between the judge and the lay jury which only by accident would have the requisite skill in a particular case, the judge reserved this function to himself, presumably as being more competent than the jury. And judges and lawyers began to call the questions 'questions of law,' as a short way of saying that they should be decided by the judge. * * * "

In the instant case, the question, in plaintiff's first claim, is whether or not the specifications were reasonably susceptible of the interpretation which plaintiff says it placed upon them in the preparation of its bid. As between judge and jury, it might be for the jury to say whether or not plaintiff did, in fact, make the interpretation, or do so at the time it alleges. But surely it would be for the judge to say, at the outset, whether or not such an interpretation could reasonably have been made. If he thought not, there would be no question for the jury.

■ My conclusion, therefore, is that plaintiff's claim for extra track lifting arose out of a dispute concerning a question of law. Consequently, the decision by the Board of Contract Appeals was not "final and conclusive," wherefore plaintiff is entitled to a review of the claim in the instant proceeding. Associated Traders, Inc. v. United States, Ct.Cl., 169 F.Supp. 502.

Plaintiff's second claim relates to the quantity of new ballast for which it was entitled to be paid.

A total of 1,227 cars of new ballast was loaded, hauled, and placed. The contracting officer credited plaintiff with 51,510 cubic yards because the specifications recited a capacity of 42 cubic yards per car.[10] While the contract was under way, plaintiff challenged the accuracy of the specifications' capacity listing, and adduced evidence tending to show that each car, as loaded, contained at least 48 cubic yards. On this basis, the pay quantity was 58,872 cubic yards.[11]

Although plaintiff requested the contracting officer to compute the pay quantities at the higher figure, he refused to do so, and plaintiff duly appealed his de-

9. Following is the text of section 1: "No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

10. Computation shows 51,534 cubic yards of 1,227 cars at 42 cubic yards per car. There was an incidental shortage of 24 cubic yards, not now in dispute, which reduced the contracting officer's pay quantity to 51,510 cubic yards.

11. The claimed quantity also makes allowance for the shortage of 24 cubic yards described in the preceding footnote.

cision. The Board of Contract Appeals reversed the contracting officer's ruling. It sustained the finding by its examiner that the average carload contained 48 rather than 42 cubic yards, ruled that plaintiff was entitled to payment "for loading, hauling, and spreading * * * 58,872 cubic yards * * * " of ballast, and directed the contracting officer to take appropriate action for the allowance of additional compensation in the amount of $7,362 (for 7,362 additional cubic yards at the unit price of $1).

Inasmuch as defendant does not now contest the ruling of the Board of Contract Appeals on the overage of 7,362 cubic yards hauled and spread, no question remains concerning this facet of the claim.[12]

Plaintiff's third claim challenges the determination of $7,362 as being the limit of compensation due to it for the extra ballast.

The bid item for "load, haul, and place ballast" called for 43,011 cubic yards. The placement of 58,872 cubic yards represented an increase of more than 36 percent above the bid item quantity. Paragraph 14 of the General Requirements of the specifications provided as follows:

"*Increased or decreased quantities of work*—The Government reserves the right to make such alterations in the plans or in the quantities of the work as may be considered necessary or desirable, and no conditions or provisions of the contract shall be thereby voided or evaded; provided, that all alterations shall be ordered in writing. The Engineer shall have the authority to order changes in plans and construction. When alterations involve an increase of more than twenty-five percent (25%) or decrease of more

than twenty-five percent (25%) and less than one hundred percent (100%) of any bid item as shown in the original proposal quantities are ordered, either the Contractor or the Government may request an adjustment of the unit bid price and a supplemental agreement setting forth the adjustment shall be executed by the Contractor and the Government; except that a supplemental agreement shall not be made for any item which is underrun one hundred percent (100%). In the event that unit bid items are increased or decreased more than twenty-five percent (25%) no allowance shall be made for anticipated profits or loss due to such changes. The Contractor shall perform the work as increased or decreased.

Plaintiff asked the contracting officer for an adjustment in the unit price applicable to the entire 58,872 cubic yards of ballast loaded, hauled, and placed. The contracting officer refused. Plaintiff appealed. The Board of Contract Appeals sustained the contracting officer and denied the claim for an adjustment.

The first question here, as in the claim for extra track lifting, is whether or not the dispute out of which the claim arose concerned a question of fact or a question of law.

No details are in evidence as to the submission to or consideration by the contracting officer of the claim for an adjustment. The examiner who heard the testimony for the Board analyzed the claim (and recommended against it) in terms of "the interpretation of the readjustment clause" for which he understood the contractor was contending.[13] The Board said that it shared "the opinion of the examiner that the appellant has

---

12. The amount allowed by the Board of Contract Appeals ($7,362) was received by the contractor on August 24, 1959.

13. In rejecting the interpretation which he ascribed to the contractor, the examiner said: "The purpose of GR–14 is to per-

mit the parties to have a second look at the bid price in the light of the changed quantities only, and to adjust for any proper and equitable change in unit costs which would result because the amount of work itself was different from that anticipated when the bid was made. * * * "

failed to prove that it is entitled to an increase in the unit price on account of such overrun," and added that " * * * it would certainly be necessary for the appellant to establish * * * that its costs for loading, hauling and placing ballast, together with a reasonable allowance for profit on this work, exceeded * * * " the unit bid price. The Board's specific conclusion was that:

"The evidence offered is * * * insufficient to admit of an informed judgment as to the existence of this essential fact, and, hence, there is no basis for an increase in the unit price."

■ It is clear that the Board's rejection of plaintiff's claim for an adjustment, although specifically based upon a failure of proof, was predicated upon the Board's interpretation of the pertinent provisions of the contract; and that this interpretation was undertaken to ascertain the intent of the parties. Independent examination of the contract provisions indicates that such a review was requisite to a determination of the dispute. I conclude, therefore, that the dispute concerned a question of law. It follows that plaintiff's claim for an adjustment is properly before this court.

On the merits of the adjustment claim, defendant points (1) to the wording of GR–14, reserving the right to the Government "to make such alterations in the * * * quantities of the work as may be considered necessary or desirable" subject to the proviso that "all alterations shall be ordered in writing"; and (2) to the fact that no alterations were ordered in writing. It was only when *alterations* involved an increase or decrease of more than 25 percent that an adjustment could have been requested.

Unfortunately, the record is barren of details concerning actions or discussions at the contracting officer's level [14] which might shed light on the contractor's efforts, if any, to gain recognition of the increased volume of ballast as an alteration. If the contractor sought such recognition from the contracting officer and was refused, the failure of the contracting officer to make an order in writing would not foreclose plaintiff.

■ Assuming that plaintiff was not foreclosed by the absence of an order in writing recognizing the increased volume as an alteration, the fact remains that plaintiff has done no better here than it did before the Board in establishing a reason for an adjustment.

The writer agrees with the Board of Contract Appeals that, before an adjustment would be in order, it would be necessary for the contractor to show that its costs for loading, or hauling, or placing the ballast, together with a reasonable allowance for profit, exceeded the unit bid price. I would add a requirement that such an increase in cost be shown to have resulted from or was attendant upon the increase in volume.[15]

As stated in finding 21(a), the evidence is insufficient to show that the use by plaintiff of a power shovel to load the ballast, in lieu of the conveyor belt equipment it had contemplated using, resulted in any increase in the cost of loading the ballast.[16]

14. As shown by finding 15(c) and footnote 19 appended thereto, plaintiff requested the adjustment of the contracting officer, who refused to accede. This fact was established, not by evidence, but by the pleadings.

15. In other words, an overrun of 25 percent in volume should not, *ipso facto*, authorize a reexamination of the unit bid price looking toward an adjustment in the contractor's favor. The larger volume might have resulted in a reduction of unit costs. If so, the contracting officer should be satisfied with evidence to that effect before requiring a downward adjustment.

16. The text of finding 17 and footnote 23 appended thereto follow: "The ballast which plaintiff used was prepared and stockpiled by another contractor. Representatives of plaintiff, who ultimately prepared plaintiff's bid, had knowledge of arrangements in contemplation for the preparation and stockpiling of the ballast before the contract therefor was made.

There is no evidence to suggest that any increase was incurred in the unit cost of hauling ballast.[17]

If an increase was incurred in the unit cost of ballast, such increase was incurred in the placing of ballast,[18] but plaintiff has advanced no such claim in this proceeding.

In support of its claim for extra track lifting, plaintiff contends that the approval by the contracting officer of its revised construction progress chart (showing that work on the bid item of "raise, line, and dress track" would begin nearly a month before the new ballast would be available) was tantamount to agreement by the contracting officer that one of the two required lifts could be made before placing new ballast. This contention falls before the contracting officer's advice, in writing, when he approved the progress chart, that:

"* * * All work shall be in accordance with the specifications and subject to the availability of materials as provided by the specifications."

As heretofore noted, plaintiff relies, for the foundation of this claim, upon the specifications being susceptible of the construction given to them by plaintiff, viz., that, while the track had to be lifted twice, for an overall raise of 6 inches, and while ballast had to be spread for an average depth of 6 inches, the contract did not call for two lifts on new ballast, as required by the contracting officer.

The contracting officer's requirement came as a surprise to plaintiff. When first apprised of it, plaintiff's superintendent asked defendant's project engineer to show him any such wording in the specifications.[19] The superintendent stood his ground with the contracting officer.[20] Thereafter, the president of plaintiff corporation expounded his thesis in great detail, reviewing various provisions of the contract and the logic of the sequences of work.[21] Similar arguments have been advanced vigorously by plaintiff's attorney, before the Board of Contract Appeals and in his brief to the commissioner of this court.

The vigor and sincerity of plaintiff's advocacy lend credence to the point of acceptance that plaintiff did place upon the specifications the construction it says it did. Vigor and sincerity alone, however, do not suffice to establish the reasonableness of the construction upon which plaintiff acted.

Careful reading of the pertinent provisions of the specifications [22] has convinced the writer that they were not reasonably susceptible of the construction given to them by the contractor. The opening condition of Bid Item No. 4 ("raise, line, and dress track") was that "ballast to make an average 6″ raise

These arrangements included the use of conveyor belts at the stockpile. In the preparation of plaintiff's bid, the assumption was made (and the bid so based) that conveyor belts would be installed at the stockpile and that plaintiff would be permitted to use such equipment in loading the cars. (Plaintiff does not contend that the contract in suit contained any mention of conveyor belt equipment.) Conveyor belt equipment was not installed at the stockpile. Plaintiff used a power shovel to load the ballast material. The cost of the use of the shovel was 37 cents per cubic yard."

17. Finding 21(c).

18. Finding 21(c) and footnote 33 appended thereto recite that the evidence does warrant the inference that an increase may have been incurred in the unit cost of placing ballast, because of the extent (in length and depth) of the sags that had to be filled. This inference flows from the fact (also inferred from the evidence as a whole) that the filling of sags and widening of banks accounted for the overrun of 36 percent in the total ballast used.

19. Finding 9(c).

20. Finding 12(b).

21. Finding 13(a).

22. As set forth in findings 5 and 6.

(1,770 cubic yards per mile) will be spread to make two separate track lifts \* \* \* ." The word "spread" implies new ballast, and the specification of 1,770 cubic yards per mile implies a depth of at least 6 inches on the average, per mile.

The inference to be drawn from the contractor's construction is that its emphasis was placed upon the later reference to "an over all lift of six (6″) inches," whereby the depth of new ballast along the whole track (not per mile) would average 6 inches. Considering the ironing out of sags and humps, where the depth of ballast would be greater or less than 6 inches, with the concomitant emphasis upon sags rather than humps,[23] the average depth of ballast along the track where there were no sizable sags or humps would be less than 6 inches: enough less to permit the placing of all required new ballast at one lift at all points except where sags requiring greater depth might call for more than one lift.

Any such rationalization as the foregoing leaves out of account the specification of 1,770 cubic yards per mile, which was of the essence of the ballast requirement. The bid quantity of 43,011 cubic yards of new ballast reflected merely the computation of 1,770 cubic yards per mile over 24.3 miles.

As indicated in the findings the specification of 1,770 cubic yards of ballast per mile may indicate that the Railroad failed to give adequate notice of what its requirements would be for sag raising and bank widening.[24] The letter of August 6, 1956, from plaintiff to the Secretary of the Interior,[25] as well as the overrun of 36 percent in the amount of ballast used, tends to support the inference that the Railroad was remiss in this particular. Plaintiff, however, has not complained here of such a fault, if fault there was.

---

23. All humps would have to have *some* new ballast, for drainage. Sags might (and, in actuality, did) require considerably more than 6 inches of new ballast to bring them up to grade.

24. Footnote 14, appended to finding 12(c).

25. Finding 14(a).