**BELL AIRCRAFT CORP. v. UNITED STATES.**

No. 47745.

United States Court of Claims.

Oct. 2, 1951.

William M. Aiken, Washington, D. C. (Dudley, Stowe & Sawyer, Buffalo, N. Y., and Covington, Burling, Rublee, O'Brian & Shorb, Washington, D. C., on the briefs), for the plaintiff.

John B. Miller, Washington, D. C., Asst. Atty. Gen. H. G. Morison (Thomas O. Fleming, Washington, D. C., on the brief), for the defendant.

HOWELL, Judge.

Plaintiff sues to recover $2,286,819.95 alleged to be reimbursable items of cost incurred in the performance of four cost-plus-a-fixed-fee contracts (hereinafter referred to as CPFF contracts) for the manufacture and delivery of military aircraft known as P-39's or Airacobras, entered into with defendant through the United States Army Air Corps.[1] Of the total sum claimed to be due under the contracts, $1,035,918.73 represent experimental and development expense, and $1,250,901.22 represent production tooling cost.[2] It is plaintiff's contention that the sum in suit represents allowable costs which should have been reimbursed pursuant to all four CPFF contracts which provide in pertinent part as follows:

"Article 3 (b). For the purpose of determining the amount payable under this contract, allowable items of cost will be determined by the Contracting Officer in accordance with regulations for determination of the cost of performing a contract as promulgated by the Treasury Department in Section 26.9 of Chapter 1 of Title 26 of Code of Federal Regulations, as contained in T. D. 5000 and approved by the Secretary of War August 2, 1940. * * *

"Article 6—*Payments*.

"(a) *Reimbursement for Cost.* The Government will currently reimburse the Contractor for such expenditures made in accordance with Article 3 hereof as may be approved or ratified by the Contracting Officer and upon certification to and verification by the Contracting Officer of the original signed payrolls for labor, the original paid invoices for materials or other original. papers; * * *"

Pertinent portions of T. D. 5000, referred to in Article 3(b) are as follows:

"Sec. 26.9. *Cost of performing a contract or subcontract*—(a) *General rule.*— The cost of performing a particular contract or subcontract shall be the sum of (1) the direct costs, including therein expenditures for materials, direct labor and

direct expenses, incurred by the contracting party in peforming the contract or subcontract, and (2) the proper proportion of any indirect costs (including therein a reasonable proportion of management expenses) incident to and necessary for the performance of the contract or subcontract.

\* \* \* \* \* \*

"(c) *Factory cost.*

\* \* \* \* \* \*

"(5) *Indirect factory expenses.*—Items usually termed 'factory overhead,' which are not directly chargeable to the factory cost of performing the contract or subcontract but which are properly incident to and necessary for the performance of the contract or subcontract and consist of the following:

\* \* \* \* \* \*

"(D) *Fixed charges and obsolescence.*— Recurring charges with respect to property used for manufacturing purposes of the contract or subcontract, such as premiums for fire and elevator insurance, property taxes, rentals and allowances for depreciation of such property, including maintenance and depreciation of reasonable standby equipment; and depreciation and obsolescence of special equipment and facilities necessarily acquired primarily for the performance of the contract or subcontract, except special additional equipment and facilities with respect to which the Secretary of the Department concerned has made a certification binding upon the Commissioner of Internal Revenue, pursuant to section 4 of the Act, in the case of such contract or subcontract. \* \* \*

\* \* \* \* \* \*

"(d) *Other manufacturing cost.*—Other manufacturing cost as used in paragraph (b) of this section includes items of manufacturing costs which are not properly or satisfactorily chargeable to factory costs (see paragraph (c) of this section) but which upon a complete showing of all pertinent facts are properly to be included as a cost of performing the contract or sub-

---

1. Pertinent details concerning these four contracts are set forth in Finding No. 18.

2. Finding No. 29.

contract, as for instance, payments of royalties and amortization of the cost of designs purchased and patent rights over their useful life; and 'deferred' or 'unliquidated' experimental and development charges. For example, in case experimental and development costs have been properly deferred or capitalized and are amortized in accordance with a reasonably consistent plan, a proper portion of the current charge, determined by a ratable allocation which is reasonable in consideration of the pertinent facts, may be treated as a cost of performing the contract or subcontract. In the case of general experimental and development expense which may be charged off currently, a reasonable portion thereof may be allocated to the cost of performing the contract or subcontract. If a special experimental or development project is carried on in pursuance of a contract, or in anticipation of a contract which is later entered into, and the expense is not treated as a part of general experimental and development expense or is not otherwise allowed as a cost of performing the contract, there clearly appearing no reasonable prospect of an additional contract for the type of article involved, the entire cost of such project may be allowed as a part of the cost of performing the contract."

Most of the experimental and development costs herein were incurred by plaintiff in the performance of certain fixed-price experimental contracts entered into with defendant in 1936, 1937, and 1938, for the construction of experimental and service test airplanes known as the "Airacuda", the "Airacobra" and the "Airabonita". (Findings Nos. 3, 4 and 5.) Subsequent to deliveries under these contracts, plaintiff incurred additional expense for further development and improvement of the design of the Airacuda (Finding No. 6.) In the case of each experimental contract, the contract price agreed to and paid by defendant represented only a portion of the cost to plaintiff of performance. These excess costs and the later costs of further developing and improving the designs, were capitalized by plaintiff as deferred charges in 1938, 1939, and 1940 for later distribution

as an element of cost against future production of the type of plane to which the experiments related.

Plaintiff's auditors allocated the deferred experimental and development costs to the three types of planes, and after deducting a sum disallowed by defendant's Army Audit Agency, there remained in the deferred account $1,499,739.23 (Finding No. 6). Plaintiff received no production contracts for Airacudas or Airabonitas, but it did receive many contracts for the Airacobra or P–39 pursuit fighter plane.

Plaintiff's production tooling costs involved in this suit were incurred first in April 1939, in connection with the performance of its contract with defendant for the production of thirteen service test models of the Airacobra (P–39). Production tooling is restricted in use to specific models or types of the product manufactured and is not as permanent and universal in character as are ordinary machine tools. Production tooling for the Airacobra or P–39 pursuit fighter plane was largely assembly tooling, consisting of long-beam assembly, subassembly and tail-assembly fixtures, all of which were fabricated in structural steel and remained in use as long as this type of plane was in production. It also included metal tubes, angles, form blocks, jigs, router templets and templet dies. In the earlier production of the experimental models, most of these fixtures had been fabricated in wood and the tooling was for temporary use only. In the production of the service planes, plaintiff was required to provide for interchangeability of certain parts, such as wings, tails, and surface landing gear, necessitating accurate duplications of the various parts. Subsequent to the April 1939 contract, plaintiff received from defendant additional fixed-price production contracts for Airacobras during 1939 and 1940 (Finding No. 9) and accordingly plaintiff increased its number of assemblies to provide for greater production, and duplicated the tooling for such assemblies, subassemblies, and such auxiliary tooling as became necessary to meet the increased production requirements.

During 1939 and 1940, plaintiff incurred costs for production tooling for the P–39

Airacobra in the sum of $1,894,109.57 and in December 1940, plaintiff recorded this sum in the deferred account along with the deferred costs of the experimental and development work. This account was entitled "Experimental, Development, and Production Tooling Expenses." Defendant's Army Audit Agency disallowed $19,-383.80 of the deferred tooling costs so recorded, leaving in the account $1,874,725.77 for allocation to future production (Finding No. 10).

In connection with the several fixed-price production contracts for P–39's entered into by plaintiff and defendant in 1939 and 1940, plaintiff was required to submit breakdowns of its estimated costs of production. At the time of the contract negotiations, only a portion of plaintiff's experimental and development costs had been determined and set up in the deferred account. Likewise, the production tooling expense involved herein had not yet been determined and set up in the deferred account inasmuch as that expense grew largely out of plaintiff's performance of those fixed-price contracts. Accordingly, the cost estimates submitted in connection with each of plaintiff's fixed-fee contracts in 1939 and 1940 did not contain any provision for the amortization of any part of the deferred experimental, development, and production tooling costs.

As of December 31, 1940, plaintiff had capitalized and deferred its experimental, development, and production tooling expense as follows (Finding No. 13):

Experimental and development expense * $1,499,729.23
Production tooling for P-39's .......... * 1,874,725.77

 Total ................................ * 3,374,465.00
* (These are the amounts approved by the Army Audit Agency, referred to above.)

Plaintiff first planned to amortize its deferred experimental, development, and production tooling expenses on the basis of the total number of planes delivered and to be delivered on all contracts on hand at the end of each year, and by prorating such costs annually against deliveries made during the current year (Finding No. 14).

Under this plan, the amount of amortization applicable to each airplane produced and delivered would decrease from year to year in proportion to the total increase in the number of planes under contract at the end of each year. At the end of 1940, plaintiff had contracted to deliver approximately 1,600 airplanes under fixed-price contracts, and in 1941 plaintiff received an additional fixed-price contract for 180 planes and parts. In the latter part of 1941 plaintiff and defendant entered into the first two CPFF contracts for 2,392 airplanes of a type similar to those produced and delivered under the aforementioned fixed-price contracts.

Plaintiff's officials were not certain that the deferred experimental, development and production tooling expense would be approved for reimbursement under their CPFF contracts as allowable costs. Accordingly, in order to avoid any question of the reimbursability of such items, plaintiff abandoned its original plan of amortization of these expenses over all related production and decided to amortize such deferred expense to the airplanes produced and delivered under the fixed-price contracts only (including the fixed-price contract entered into in 1941) (Findings Nos. 15 and 16). By the end of 1942, plaintiff had amortized the entire amount carried in its deferred account against deliveries of airplanes under its fixed-price contracts (Finding No. 17).

Commencing on August 14, 1941, plaintiff entered into a series of cost-plus-a-fixed-fee contracts with defendants for the production of P–39 (Airacobra) airplanes.[3] One contract was ultimately completed, one was terminated, and two were terminated for the convenience of the Government on August 14, 1945, with termination settlement agreements consummated pursuant to the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq. (Finding No. 18).

As stated above, by the end of 1942 plaintiff had allocated all of its deferred experimental and production tooling expenses to production under its fixed-price contracts

3. Data concerning the dates, quantities, estimated costs and specified fixed fees, are contained in a table in Finding No. 18.

although the items being produced under the CPFF contracts bore as close a relation to such deferred expenses as did the items produced under the fixed-price contracts. In 1942 the Bureau of Internal Revenue of the Treasury Department insisted that for income tax purposes, the deferred expenses in question should have been allocated to planes produced under the CPFF contracts as well as to planes produced under the fixed-price contracts, and, despite plaintiff's protests, the Bureau adjusted plaintiff's income for 1941 and 1942 for amortization purposes by reallocating such expenses to deliveries made under both types of contracts, and allowing as a cost deduction, only a portion of the deferred expense. This reallocation increased the amount of plaintiff's taxable income for these years, and additional taxes were assessed and paid for those years in the approximate amount of $1,337,474.89 (Finding No. 34).

In 1943, Major Knox B. Phagan organized defendant's contract renegotiation activities in the Eastern District Air Forces. Such activities were handled by the Price Adjustment Section of which Major Phagan was Chief. In 1943, the renegotiation of plaintiff's profits on its fixed-price contracts came before that Section. It was the purpose of that Section to make a fair determination of a war contractor's profits in order to determine whether or not such profits were excessive and should be paid back to the Government under the Renegotiation Act of 1942, 56 Stat. 245, 50 U.S. C.A.Appendix, § 1191. Major Phagan testified that his attention had been called to the action of the Bureau of Internal Revenue in disallowing the allocation by plaintiff of all of its deferred experimental, development, and production tooling expenses to production under its fixed-price contracts, and stated that in general it was the policy of the Price Adjustment Section to follow the decisions of the Bureau of Internal Revenue in such matters for the purposes of renegotiation. Accordingly, the Price Adjustment Section took the position that plaintiff's allocation of all its deferred experimental, development, and production tooling expense to its fixed-price

production alone, improperly reduced plaintiff's actual profits on such fixed-price contracts, and that such expenses should have been amortized over production under the cost-plus as well as the fixed-price contracts. Compliance with the position of the Price Adjustment Section, would have resulted in defendant's recouping much larger sums as excessive profits on plaintiff's 1942 income.

On September 7, 1943, plaintiff, by its Comptroller, wrote to the Price Adjustment Board, War Department, setting forth the facts concerning its treatment of the expenses in the deferred account, and stating that Bell was prepared to change its method of amortizing such deferred expense to conform to the views expressed by the Bureau of Internal Revenue and the Price Adjustment Board on condition that the proportion of the deferred expense disallowed by the Board and the Bureau on the ground that it was properly allocable to CPFF production, should become items of reimbursable costs under Bell's CPFF contracts and be allowed and reimbursed as such by the Contract Audit Section of the Army Air Forces and the General Accounting Office (Finding No. 23). On receipt of plaintiff's letter, Major Phagan caused the following statement to be placed on a copy of the letter which he then signed and returned to plaintiff: "The explanation and method of amortization set forth in this letter is in accordance with our understanding and has our approval."

On September 9, 1943, in accordance with the views of the Bureau of Internal Revenue and the Price Adjustment Board, plaintiff restored to its deferred account the proportion of experimental, development, and production tooling expense which it had been agreed were applicable to airplanes delivered and to be delivered under plaintiff's CPFF contracts, as follows:

Experimental and development costs..... $1,035,918.73
Production tooling for P-39 planes........ 1,250,901.22

The unrestored difference of $1,087,645.05 previously amortized, represented that portion of experimental, development and production tooling expense which was properly applicable to deliveries under plain-

tiff's fixed-price contracts in accordance with the approved plan of reamortization.

Plaintiff then prepared and submitted for the approval of the Contracting Officer, reimbursement vouchers in the sum of $451,179.96 representing the reallocation of its amortization of experimental, develop-ment, and production tooling deferred ex-pense to deliveries under its CPFF con-tracts during 1942, and vouchers in the sum of $848,676.06 applicable to deliveries under its CPFF contracts during the period from January to August, inclusive, of 1943 (Find-ing No. 24). Defendant's Assistant Resi-dent Auditor, Mr. DiLapo, considered the vouchers and recommended to the Resident Auditor, Mr. Campbell, that they be re-jected as not constituting costs allowable under the contract for the following rea-sons: that in the period prior to the in-ception of the CPFF contracts, the con-tractor had followed a consistent policy of charging off all of these experimental, development, and production tooling ex-penses against its fixed-price contracts which were then in effect; that in the opin-ion of the assistant auditor there was no provision in the CPFF contracts for the reimbursement to a contractor of *losses* suffered under fixed-price contracts (re-ferring to Bell's prior fixed-price experi-mental contracts in 1936–1938). It would appear that Mr. DiLapo had in mind Sec-tion 26.9(g) (4) of T.D. 5000 which pro-vided in part as follows: "Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered in determining such costs, are the following: * * * losses on the other contracts: * * *" Mr. Campbell, the Resident Auditor, did not agree with this position and certified the vouchers to the Contracting Officer, Mr. Bancroft Mitchell. The Contracting Officer approved the vouchers for reim-bursement under the CPFF contracts and plaintiff was paid the sums shown thereon, totalling $1,299,856.02, by defendant's Fi-nance Officer.

Commencing in October 1943, plaintiff submitted additional reimbursement vouch-ers for experimental, development and production tooling expenses representing the proportionate amounts applicable to deliveries subsequent to August 1943 under its CPFF contracts. These vouchers, in the amount of $986,963.93 (Finding 24), represented all the remaining experimental, development and production tooling ex-pense in the deferred account and appli-cable, under the reamortization plan, to CPFF production. At the time these vouchers began to arrive for audit in Oc-tober 1943, defendant's Resident Auditor, Mr. Campbell, had been replaced by Mr. Ferris, and the Contracting Officer had been replaced by Captain Davies. Mr. DiLapo was still assistant auditor and he again urged that the expenses represented by the vouchers were not allowable items of cost under the CPFF contracts and should not be paid. His reasons were the same ones previously urged upon Mr. Campbell, and were apparently concurred in by his new superior as well as by a succeeding Resident Auditor, Mr. Leibman. At any rate, the auditors withheld certification of these vouchers.

In April and May of 1944, the Chief Cost Auditor for the General Accounting Office, Buffalo area, submitted to the Resident Auditor a series of "informal inquiries" relative to the previous payment of vouch-ers covering the $1,299,856.02 of experi-mental, development and production tooling expense. The General Accounting Office excepted to such prior payments on the ground that because the deferred expenses had originally been amortized against fixed-price production contracts, "the status of the account [presumably the deferred ac-count] at the time of the negotiations with respect to the estimated costs under his [the contractor's] contract was such as to pre-clude consideration thereof as an existing 'Deferred' or 'Unliquidated' charge to the contract" (Finding No. 27). Following for-mal notices of exception and suspensions of the accounts of Col. Harris, the Finance Officer, issued by the Comptroller General of the United States in August 1944, the Finance Officer recouped the $1,299,856.02 previously paid to plaintiff by withholding from plaintiff sums totaling that amount which were otherwise due plaintiff.

In the meantime, plaintiff's last series of vouchers, submitted in 1943, and covering the balance of its experimental, development, and production tooling expense in the amount of $986,963.93 had not been acted on by the Contracting Officer. On January 10, 1945, Captain Davies, as Contracting Officer, rendered findings of fact and a decision on these vouchers adverse to plaintiff. On March 1, 1945, Captain Davies rescinded his prior decision and forwarded new findings of fact and a decision (Finding No. 30). The two documents were substantially the same and both concluded that the items of expense covered by the vouchers were not allowable costs under the CPFF contracts and would not be reimbursed. Pertinent details of these two decisions will be discussed hereinafter.

On March 27, 1945, plaintiff appealed the findings and decision of the Contracting Officer to the War Department Board of Contract Appeals and on April 29, 1946, that Board rendered its decision in which it denied plaintiff reimbursement of the sum of $986,963.93. Plaintiff's application for a rehearing was denied by the Board on May 31, 1946.

We shall first consider defendant's administrative defenses. These defenses are, (1) that plaintiff failed to exhaust the administrative remedies provided for in its contracts with respect to the $1,299,856.02 of its claim which was originally paid to plaintiff and later recouped by defendant from money otherwise due plaintiff, and (2) that the decision of the Board of Contract Appeals, adverse to plaintiff with respect to its right to reimbursement for the balance of its claim ($986,963.93), was final and binding on the parties and therefore not reviewable by this court.

### Alleged failure of plaintiff to exhaust its administrative remedies

Plaintiff's claim falls into two parts for the purpose of defendant's administrative defenses. That part which is the target of the above defense is the $1,299,856.02, representing a portion of the experimental, development, and production tooling expense carried in the deferred account and allocated, under plaintiff's revised books, to production of items under the CPFF contracts. Vouchers covering this amount were recommended for approval by defendant's Resident Auditor, approved by the first Contracting Officer, and paid by defendant's Finance Officer in 1943. Subsequently, the General Accounting Office came to the conclusion that the CPFF contracts did not authorize the allowance of such expenses as costs of performing the CPFF contracts, and the Comptroller General suspended the accounts of the Finance Officer who had made the payments to plaintiff. The Finance Officer immediately recouped the amount suspended by withholding from plaintiff an equivalent sum otherwise admittedly due plaintiff. Plaintiff has taken no steps to secure a reversal of the last action of the Finance Officer or to recover the amount withheld other than by bringing this action in court.

It is plaintiff's position that no administrative remedies were provided by its CPFF contracts against the recoupment; that the action of the first Contracting Officer in determining, under Article 3(b) of its contracts that the amounts shown on the vouchers were allowable costs, was conclusive; that the decision of the Comptroller General, and that portion of the decision and findings of second Contracting Officer in March 1945, which purported to pass on the propriety of the action of the first Contracting Officer, were without effect; that no dispute ever arose under the Disputes article of the contracts concerning this matter and that plaintiff's only remedy lay in the Court.

Defendant's position is that Article 3(b) of the CPFF contracts merely vests the Contracting Officer with *discretion* to determine allowable costs; that the approval of the vouchers by the first Contracting Officer under that article was purely *routine* and not conclusive nor binding upon the Government; that in any event a dispute did arise involving the sum covered by these vouchers and the recoupment of that sum, which was decided adversely to plaintiff under the Disputes article of the CPFF contracts by the second Contracting Officer in a decision dated March 1, 1945; that

plaintiff did not appeal to the Head of the Department from that portion of the findings and decision relating to such previously approved and paid vouchers, and that accordingly plaintiff has no standing in court with respect to that portion of its claim.

■ We cannot agree with defendant's contention that Article 3(b) of plaintiff's CPFF contracts merely vested the Contracting Officer with discretion to determine allowable items of cost under T.D. 5000. That article does not say that the Contracting Officer *may* determine allowable items of cost in accordance with T.D. 5000. It says that the Contracting Officer *will* so determine the allowable items of cost. The contract article dealing with "payments" (Finding No. 20) provides that the Government *will currently* reimburse the contractor for such expenditures made in accordance with Article 3 as may be approved or ratified by the Contracting Officer. These articles, we think, imposed upon the Government the duties of determining whether costs were allowable under T.D. 5000 and of approving them for reimbursement if they were.

■ We next turn to the effect of the determination made by the first Contracting Officer under Article 3(b) that the $1,299,-856.02 of experimental, development and production tooling costs evidenced by the vouchers, were allowable items of cost under T.D. 5000. First, we think that a determination made by a Contracting Officer under that Article, followed by actual payment to plaintiff, is conclusive and binding on the parties unless the contractor, being dissatisfied with the decision, makes an objection to it which would result in a dispute to be resolved by the means provided in the Disputes article of the contract. In the case of James Stewart & Co. v. United States, 71 Ct.Cl. 126, certain vouchers had been approved by the Contracting Officer under a CPFF contract between plaintiff and the Government, and the amounts shown on the vouchers were paid by the disbursing officers of the Government. The General Accounting Office, deeming the action of the Contracting Officer in approv-

ing the vouchers to have been erroneous, made certain disallowances to the amount of such vouchers in the accounts of the disbursing officers. The Government then sought to recoup such amounts from the contractor by means of a counterclaim against a judgment rendered by this Court in plaintiff's favor in another matter. The Contracting Officer had approved the payment of the vouchers under an article of the CPFF contract which provided in part as follows: "*Cost of the work.* The contractor shall be reimbursed in the manner hereinafter described for such of its actual net expenditures in the performance of said work as may be approved or ratified by the contracting officer * * *." The Government contended that the approval of the Contracting Officer under such article was not conclusive, and that upon a showing by the Government that the Contracting Officer was in any respect wrong in making his decision, the Government might recover. The court held that the decision of the Contracting Officer under the above quoted article of the contract was conclusive and was binding on the Government. Judge Green, speaking for the court, said, inter alia:

"If the decision of the contracting officer as shown by his approval or ratification was not final, his act in so doing was merely an idle gesture, for the contention of defendant is that notwithstanding such approval it can raise any objection to these items that it sees fit. We do not think the contract can properly be so construed. In fact to so construe it would have the effect to strike from the contract the words 'as may be approved or ratified by the contracting officer,' for they become absolutely useless. * * * The actions of the parties * * * show very plainly that both parties considered that, subject to other provisions in the contract having no bearing on this particular case, the decision made by the contracting officer was final, and such would be the ordinary meaning given to the provision under consideration. It should also be noted in this connection that there is neither allegation nor proof of fraud, bad faith, or palpable disregard of the rights of either party by the contracting officer. So

far as it appears from the evidence, he exercised the authority given him with an honest purpose to carry out the intention of the parties to the contract and his action was an exercise of the power conferred upon him by that instrument. He discharged that duty by the mutual assent of both parties. The terms by which the power was conferred and the duty imposed are clear and precise and they are susceptible of no other interpretation than that the action of the contracting officer in the matter of expenditures was intended to be conclusive, in the absence of fraud, such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment. 71 Ct.Cl. at pages 129, 130."

In the instant case the Government does not claim and the record fails to show that the act of approval of the first Contracting Officer constituted gross mistake, or that his approval was secured by fraud on the part of the contractor. In its characterization of the approval as "routine", the Government does seem to imply that the Contracting Officer failed to exercise honest and independent judgment, but the record in the case does not sustain such a characterization. When these vouchers were presented for approval, the Contracting Officer first sought the advice and recommendation of the Resident Auditor and his staff. An assistant resident auditor was of the opinion that the expenses sought to be reimbursed as costs allowable under the contract, were in reality losses suffered by plaintiff on prior fixed-price experimental contracts and that the CPFF contract specifically provided against the allowability of such expenses as costs. This opinion was not concurred in by the Resident Auditor who recommended to the Contracting Officer that the vouchers contained items properly allowable as costs under the contract. The Contracting Officer agreed with the opinion of the Resident Auditor and approved the vouchers for payment. This set of facts does not, we think, indicate a routine approval of the payment of such a large amount by the Contracting Officer, but rather an independent and honest exercise of his judgment. We accordingly conclude that the first Contracting Officer's decision under Article 3(b) of the contracts approving the vouchers for payment, was in the circumstances of this case, conclusive and binding on the Government.

The action of the Comptroller General in suspending the accounts of the Finance Officer who had made the payments on the vouchers approved by the first Contracting Officer, and its opinion that the items covered by those vouchers were not allowable items of cost under the contract, did not have the effect of reversing the decision of the first Contracting Officer. As the Supreme Court said in United States v. Mason & Hanger Company, 260 U.S. 323, 43 S.Ct. 128, 67 L.Ed. 286: "Over the effect of these [decisions of the Contracting Officer] the Comptroller of the Treasury has no power. They were the acts and duty of the officer in charge in the expression of which there was no ambiguity, and were, therefore, conclusive in effect." 260 U.S. at page 326, 43 S.Ct. at page 129.

Next, we come to defendant's contention that a dispute under Article 16 of the contract arose which involved not only the unpaid vouchers for the balance of the deferred expense, but also involved the propriety of the first Contracting Officer's approval of the earlier vouchers, and also the matter of the Government's recoupment of the amount paid to plaintiff pursuant to those vouchers. The defendant says that the second Contracting Officer rendered findings of fact and a decision adverse to plaintiff, and that plaintiff, having failed to appeal to the Head of the Department from that portion of the decision relating to the decision of the first Contracting Officer and the recoupment, has failed to exhaust its administrative remedies under the contract and now has no standing in court as to those matters.

The findings of fact and decision of the second Contracting Officer, dated March 1, 1945, to which defendant refers, did purport to pass on the allowability as costs of the deferred expenses represented by the vouchers previously approved by the first Contracting Officer and paid to plaintiff by the Finance Officer, and also on the matter of the recoupment of a similar amount pur-

suant to the decision and suspension action of the General Accounting Office. Actually, we think, the only matter before the second Contracting Officer for decision on March 1, 1945, was the allowability under the contract and T. D. 5000 of items of expense contained in a series of vouchers totaling $986,963.93, representing the balance remaining in Bell's deferred experimental, development, and production tooling account, and which had been allocated by Bell to production under the CPFF contracts. These vouchers began to arrive for audit in October 1943 but none of them were officially acted on until March 1, 1945. At about the time of the first presentation for audit of these particular vouchers, a new Contracting Officer had replaced the officer who had approved the previous series of vouchers, and a new resident auditor was also present on the job. The assistant resident auditor who had recommended disallowance of the first series of vouchers, again made the same recommendation with respect to the second series, and his recommendation was ultimately accepted by the new resident auditor and the new Contracting Officer. In the summer of 1944, following informal inquiries initiated by the General Accounting Office into the payment of the first series of vouchers, and after the suspension of the accounts of the Finance Officer of a sum equal to the amount which had been paid to plaintiff under those vouchers, the Finance Officer recouped the amount suspended by withholding an equivalent amount from money otherwise due plaintiff. At that time, the second Contracting Officer still had taken no final action on the second series of vouchers. Apparently, on December 10, 1943, the resident auditor on the Bell job had written to the District Auditor, Eastern Procurement District, under a subject heading "Amortization of Losses on Fixed Price Contracts," and covering Bell's treatment of the entire amount of experimental, development, and production tooling expenses carried in the deferred account. On January 20, 1944, the Eastern Procurement District forwarded the letter of December 10, 1943, and all subsequent correspondence on the matter, to the Chief of the Procurement Division for his views "as to the right of Bell to be reimbursed under its CPFF contracts for any portion of the said amount." On November 13, 1944, the Chief of the Procurement Division wrote to the District Supervisor of the Eastern Procurement District reviewing in general the facts concerning the deferred account and Bell's handling of the account, and expressing the opinion that the amount of such expense which Bell had allocated to the CPFF contracts did not, in fact, represent costs of performing such contracts, and concluding as follows: "It is therefore the opinion of this Headquarters that Bell is not entitled to reimbursement under its CPFF contracts for P–39 and P–63 airplanes for any portion of the said sum of $2,286,819.95." The sum so mentioned included both the amount covered by the vouchers approved by the first Contracting Officer and paid to plaintiff, and the amount covered by the second series of vouchers which were before the second Contracting Officer for approval.

On January 10, 1945, the second Contracting Officer wrote to plaintiff stating that he was forwarding a copy of the above-mentioned decision of the Chief of Procurement on the reimbursement of amortization of development and experimental expense over CPFF contracts, and that the Contracting Officer was incorporating that decision as his findings of fact "in denying reimbursement to the contractor for this expenditure, as requested on Audit Bureau Vouchers as follows:". The contracting officer then listed the unpaid vouchers totaling $986,963.93. On March 1, 1945, the Contracting Officer wrote to plaintiff again stating that the findings of fact and the decision which he had rendered on January 10, 1945, were rescinded and new findings and a decision were being forwarded. The new findings began with a listing of the identical unpaid vouchers, and continued almost word for word in the same manner as previously, except for the omission of the first paragraph of the prior findings which had related to the circumstances under which the Chief of Procurement Division was rendering advice, and a change in the last sentence of the "findings" to make it read, "It is, therefor, the decision of the

Contracting Officer" rather than "It is therefore the opinion of this Headquarters."

The November 13, 1944, letter from the Chief of Procurement, was merely an expression of the views of that office on the question of. the reimbursability of deferred experimental, development, and production tooling costs under plaintiff's CPFF contracts. That letter discussed the problem generally and referred to the entire amount in the deferred account and to the vouchers previously approved and paid, as well as to the subsequent series of vouchers which were before the Contracting Officer for approval. The Contracting Officer, for some reason, adopted this letter (as pointed out above) as his findings of fact and decision, but since the only matter · actually before the Contracting Officer for decision was the approval or disapproval of the second series of vouchers, the findings and decision of the Contracting Officer are without any effect on plaintiff insofar as they related to vouchers other than the second series actually before .him. In its subsequent and timely appeal from this decision to the Board of Contract Appeals for the War Department, plaintiff referred only to the second series of vouchers which had been disapproved, and the Board confined its decision to the matter of the disallowance of those particular vouchers.

In our opinion, plaintiff was not obliged by its contract to take an appeal from that portion of the second Contracting Officer's decision which purported to pass on the matter of the prior approval of the first series of vouchers, or on the matter of the recoupment. The decision of the first Contracting Officer had been favorable to plaintiff and no dispute arose over his decision which called into play the provisions of the Disputes article. Further, there was no occasion for the second Contracting Officer to make any findings or render any decision with respect to such prior decision of the first Contracting Officer. Plaintiff had nothing to appeal from with respect to the decision of the first Contracting Officer and the contracts afford the Government no right of appeal from that decision. The Government's only recourse, if it disagreed with such a decision, was to effect recoup-

ment if possible, and, in the event of a lawsuit, attempt to show that because of some vital circumstance, the decision of the first Contracting Officer had been robbed of its usual conclusiveness.

The subsequent recoupment of an amount equal to that covered by the first vouchers which had been approved and paid, was not a matter which plaintiff was bound to appeal to the head of the department under any provision of its contract. If anything, it was a matter which plaintiff might consider a breach of the Government's contractual undertaking to pay sums admittedly due, and was the proper subject of a lawsuit.

■ We conclude that plaintiff has not failed to exhaust its administrative remedies with respect to the first series of vouchers or the recoupment of the amount paid under such vouchers. Furthermore, inasmuch as the defendant has failed to point to any circumstance which would defeat the conclusiveness of the decision of the first Contracting Officer, and since the General Accounting Office was without the power to reverse such decision, plaintiff is entitled to recover the amount approved for payment, paid and subsequently recouped, in the sum of $1,299,856.02.

*Finality of the decision of the War Department Board of Contract Appeals*

That portion of the second Contracting Officer's findings and decision of March 1, 1945, which dealt with the allowability as costs of $986,963.93 of deferred experimental, development, and production tooling expense, was duly appealed by plaintiff to the War Department Board of Contract Appeals and that Board decided that such items of expense were not reimbursable under plaintiff's CPFF contracts.

Defendant says that pursuant to the Disputes articles in the CPFF contracts, the decision of the Board was final and that no appeal therefrom lies in the courts. The Disputes article appearing in. each of the contracts is the usual one in the standard form of Government contracts, and provides that, except as otherwise specifically provided in the contract, all disputes con-

cerning questions of *fact* arising under the contract, not disposed of by mutual agreement, shall be decided by the Contracting Officer in writing; that such decision may be appealed by the contractor within 30 days to the Secretary of War or his designated representatives, whose decision thereon shall be final and conclusive upon the parties thereto (Finding No. 20).

It is plaintiff's position that the decision of the War Department Board of Contract Appeals is not binding on this Court because the Board's conclusion concerned a question of law and not of fact, but that if the Court should consider the question to be one of fact, then the Board's conclusion is not binding because it is arbitrary and capricious and directly in conflict with its own primary findings of fact.

Defendant contends that the question in dispute and decided by the Board was one of fact and not one of law. Defendant points out that the Contracting Officer had found as a fact that the sum in question "which plaintiff had charged on its books against CPFF contracts does not, in fact, represent costs of performing such CPFF contracts." Defendant urges that by dismissing plaintiff's appeal, the Board was, in effect, sustaining that finding of fact.

In its decision the Board set forth the facts concerning plaintiff's deferred account and its fixed-price and CPFF contracts, much as we have done in our findings of fact herein. The Board stated that there was no dispute between the parties as to the amount of the costs involved, nor as to the propriety of the plaintiff's method of allocation; that the CPFF contracts provided that allowable items of cost were to be determined by the Contracting Officer in accordance with the pertinent provisions of T. D. 5000; that the experimental and development costs in question were clearly within the category of indirect costs as defined by T. D. 5000 and were specifically covered by Section 26.9(d) thereof; that the production tooling covered by the deferred production tooling costs were used in the performance of the CPFF contracts; that such items of cost were within the intent and meaning of T. D. 5000, specifically, Section 26.9(c) (5)

(D) (Finding No. 31). The Board then stated, however: "Although it is true that costs of this type may properly be allowed as reimbursable items under T. D. 5000, it does not follow that such costs *must* be reimbursed under T. D. 5000 in all cases and *under all circumstances.* In order to determine whether such items of costs should be reimbursed it is necessary to examine all of the circumstances and facts involved." [Italics supplied.] The Board then referred to the fact that plaintiff had originally planned to amortize all such expense over a fixed-price contracts only; that after entering into the CPFF contracts, plaintiff had changed its plan of amortization in accordance with the position taken by the Bureau of Internal Revenue and the Renegotiation authorities, and had revised its books to spread the amortization over *all* its contracts for production of the P–39 airplane, both fixed-price, and cost-plus. The Board concluded as follows: "Under these circumstances, it is difficult to understand how it can now be reasonably contended that an item of cost is reimbursable under the terms of the subject contracts, when, at the time the contracts were negotiated appellant did not intend that the item should be reimbursable and was in fact charging the costs in question against other contracts in accordance with a previously adopted plan. * * * Under the circumstances here present, the Board is of the opinion that the costs are not reimbursable under the subject contracts." In making the above statement, we think the Board had reference to the language in T. D. 5000, Sec. 26.9(d) which states that "upon a complete showing of all pertinent facts [these costs] are properly to be included as a cost of performing the contract * * *." Accordingly, the Board held that the circumstance of plaintiff's not having originally intended to allocate any portion of such costs to the CPFF contracts was one of the circumstances contemplated by the contract (T. D. 5000) as foreclosing reimbursement of this type of cost, otherwise reimbursable. This was not, we think, a conclusion that the items in question were not "costs of performing such CPFF contracts." Without going into the merits

of whether this was the sort of circumstance or "pertinent fact" contemplated by Section 26.9(d) of T. D. 5000, we think that the Board's decision on whether, under the circumstances here present, the contract required reimbursement, involved an interpretation of plaintiff's CPFF contracts. That the Board itself so viewed its decision is indicated by the following language in its decision: "There is no dispute between the parties as to the amount of the costs or as to the propriety of the method of allocation used by appellant. The only question presented is whether reimbursement for any portion of these costs is authorized or required by the subject contracts under the circumstances here involved."

▪ In the case of Wunderlich v. United States, 117 Ct.Cl. 92, we pointed out that the distinction between questions of law and questions of fact is not always a clear one, but that in general the courts have held that questions of the interpretation of contracts are not "questions of fact" within the meaning of that expression as it is written into the Disputes articles of Government contracts. McWilliams Dredging Company v. United States, No. 48894, decided June 5, 1950, and cases cited therein. In its decision in the Bell case, the Board of Contract Appeals noted that the contracts all contained the standard "Disputes" article which referred only to decisions on questions of fact. The Board then stated: "Insofar as the questions presented by this appeal are questions of law they will be administratively determined pursuant to the memorandum of the Secretary of War dated 4 July 1944." That Memorandum gave the Board the following power, *inter alia:* "(b) Consider and administratively pass on appeals not specifically or impliedly authorized by the contract where the ruling appealed from is not thereby made final and conclusive, and the appeal is taken within the time fixed in the contract for appeals." The appeal in this case to the Board was from a decision of the second Contracting Officer that the items of expense involved were not allowable

items of cost of performing the CPFF contracts, and also from his decision that such items were accordingly not reimbursable under the contracts. In his decision, the Contracting Officer made no reference to Article 3 of the contracts nor to T. D. 5000. In reviewing this decision, the Board carefully analyzed both the contract and T. D. 5000 and made findings not previously made by the Contracting Officer. The Board then concluded that the phraseology of the contract and T. D. 5000 made the items in question allowable items of cost,[4] but that certain circumstances, not specified in the contract or in T. D. 5000, but which, in the opinion of the Board, were contemplated therein, constituted a bar to reimbursement.

The decision of the Contracting Officer that the CPFF contracts did not permit reimbursement of these items was an interpretation of the contract and thus did not involve a question "of fact." The contracts themselves did not specifically nor impliedly authorize an appeal from such a decision, nor did the contracts make such a decision final and conclusive. In reviewing such a decision of the Contracting Officer, and in rendering its decision, the Board of Contract Appeals was only exercising the power defined in the Memorandum of the Secretary of War to consider and administratively pass on an appeal of this sort. Nothing in that Memorandum nor in the contracts, made the Board's decision on that question binding on plaintiff so as to preclude an appeal therefrom to the court. The Board might well have refused to exercise its discretion to render a decision in this case. In Appeal of Quipco Associates, Inc., (ASBCA No. 841, July 30, 1951,) the Board had the following to say: "The question as to what in fact was the subject matter of the contract of sale presents an issue which can be resolved only by a proper construction of the contract as a whole. Whether the contract, properly construed, contemplated identification of the subject matter of the sale by any words of description contained in the contract, or contemplated identification in some

4. To that extent the Board's ruling appears to be contrary to the ruling of the Contracting Officer.

other manner such as by seller's display of the materials offered for sale, and whether or not Appellant is now entitled to any relief, including rescission, on the basis of the facts alleged, concerns essentially questions of law. * * * Any relief to which Appellant may be entitled could be granted only on the basis of a determination that as a matter of law the quoted provisions [of the contract], despite its phraseology, does not bar the granting of such relief. In that respect, also the dispute does not lie within the scope of the disputes clause * * * which is limited to disputes concerning questions of fact." In some cases the Board has, as in the instant case, exercised its discretion to administratively pass on a "question of law." In the Appeal of Nash-Kelvinator Corporation (NBCA 289, April 24, 1947) and in the Appeal of Consolidated Vultee Aircraft Corporation (NBCA 524, February 28, 1949) the Navy Board of Contract Appeals had before it questions similar to the one in suit, i. e., whether under CPFF contracts the contractor was entitled to reimbursement as allowable costs, of a properly allocated portion of certain contributions made to local charitable organizations. The Board in each case stated that it was considering the appeal pursuant to its directive from the Secretary of the Navy, which directive gave the Board *discretion* to consider and administratively pass on questions involving interpretations of contracts. In both cases the Board held that the contracts, properly interpreted, entitled the contractors to reimbursement for the contributions in question. In the Consolidated Vultee case, the contracting agency acquiesced in the Board's decision and requested payment be made to the contractor. The General Accounting Office, however, refused to permit payment and the contractor brought suit in the District Court. Consolidated Vultee Aircraft Corporation v. United States, 97 F.Supp. 948. It is interesting to note that in the District Court proceeding, the Government's principal defense was that the Navy Board of Contract Appeals had no jurisdiction to decide *finally* whether an item of alleged cost was reimbursable under the CPFF contract because, under the Disputes article

of the CPFF contract, its jurisdiction was confined to deciding questions of fact, whereas the question to be decided involved the interpretation of the contract, and, as such, was not a question of fact. The District Court did not pass on whether the question involved was one of fact or otherwise, and we mention the case only because in the instant controversy, involving an almost identical question, the Government is contending that the question is one of fact.

■ There is no doubt in our minds that the question decided by the War Department Board of Contract Appeals in the Bell case involved the interpretation of the CPFF contracts and the question was therefore not one of fact. Accordingly, an adverse decision of that Board did not bar plaintiff from bringing an appeal therefrom to this Court.

We now turn to the parties' position concerning the merits of the controversy on the law and on the facts.

Defendant says that the deferred experimental and development expenses are not properly allowable costs because in reality they were losses suffered by plaintiff in the performance of its fixed-price experimental contracts in 1936, 1937 and 1938 and that their reimbursement is specifically forbidden by Section 26.9(g) (4) of T. D. 5000 which reads in part as follows: "* * * Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered in determining such cost, are the following: * * * losses on other contracts; * * *"

It is true that the bulk of the expenses in question contained in the deferred account were incurred in the performance of the experimental contracts with the Government, although a portion of them were incurred by plaintiff in the course of further research after completion of the experimental contracts. It is also true that the contract price agreed to and paid by defendant on each experimental contract was much less than the actual cost to plaintiff of performance.

In the performance of a *production* contract, if the cost of performing exceeds the sale price of the articles produced,

such excess costs certainly represent a loss since the purpose of a production contract is to realize an amount in excess of all costs of production. However, in the performance of an experimental contract, the failure to realize therefrom an amount over and above the costs of performance does not necessarily result in a loss. Experimental and development costs are similar to organization expense or preliminary work in connection with any project or contract, the benefits of which will inure to an indefinite period of later operations. The benefit of such costs may well apply to later production, the extent of which might be indefinite or possibly unknown at the time the costs are incurred. Business prudence, however, would preclude the deferment of any costs of this nature unless the management had reasonable grounds for believing that it would receive contracts or other business against which such costs might properly be amortized. Where there is reasonable expectation that the research and experimentation carried on in the performance of an experimental contract will be used in future production contracts, the costs in excess of the contract price paid for such experimental work are properly to be deferred and carried in the contractor's financial statement as intangible assets (sometimes referred to as temporary capital assets), although they may represent substantial costs incurred for designs, formulæ, patterns and engineering tables having great value in the production of the type of product for which such designs and calculations were prepared. If the project for which such experimental and development expenses were incurred were completely abandoned and an entirely new venture pursued, then these deferred costs would be determined to have no inherent value or benefit to later production and would be charged off to the company's surplus account even though a deficit would result.[5] However, where the company secured production contracts for items directly related to the experimental work, the

deferred intangible assets are usually and properly amortized and written off against such production so that the financial statement of the company will be void of items of an indeterminable value. The period of amortization may be indefinite and will depend largely upon the prospects of volume production which would benefit by the deferred costs previously incurred.

In plaintiff's case, the demand for fighter planes was greater than production capacity. As early as 1938 plaintiff was reasonably sure that future production contracts would result from its experimental work on the fighter planes, and it commenced to defer its experimental and development expense. The war in Europe started in September 1939 and during that year plaintiff received its first production contract (a fixed-price contract) for approximately 87 P-39 fighter planes. At the end of 1939 and the end of 1940 plaintiff deferred additional costs which it incurred in the course of further experimental and development work for this type of plane. Other production contracts for the plane were received in 1940 which assured increased production of this type of plane.

In view of the continuity of the demand and the war engagements of the United States, it was reasonable and proper for plaintiff to extend the period of amortization against performance of production contracts which it received from time to time after 1940. Since the production contracts contained adequate provisions for compensation in case of termination for the convenience of the Government, it was also proper to include the total number of planes specified in such contracts as a basis for prorating the amortization of the experimental and development costs. Plaintiff could, within the limits of any possible corporate charter restrictions, have amortized these intangible capital assets over part or all of the production contracts directly related to the experimental work which created the assets. Inasmuch as all the items produced under the contracts were so relat-

5. In the instant case, for example, if plaintiff had diverted its attentions and efforts to the production of ships, tanks or automobiles to which its experimental and de-velopment work would have no application, it would have been improper for plaintiff to have deferred such costs for application against later production.

ed, it was the best practice to carry out the amortization over all such contracts since such experimental expenses were truly an element of the cost of producing each item called for by such contracts.

The terms "costs" and "losses" are not synonymous, and in the case of experimental projects which lead to profitable production contracts, the excess of costs of the experimental work over the price paid for such work, represents a temporary or intangible capital asset and not a loss. In plaintiff's case, the experimental and development work which it had done led to its receiving very large production contracts, and the products so manufactured embodied benefits which derived from the prior experimental work. Therefore the costs incurred in the latter would in no sense be considered losses, notwithstanding the fact that the actual costs of the experimental work were not fully recovered under the experimental contracts.

■ We accordingly conclude that the prohibition against inclusion as costs of performance in production CPFF contracts of losses sustained on other contracts (T. D. 5000, Sec. 26.9(g) (4)) does not apply to these experimental and development costs.

Next, defendant contends that the production tooling expenses carried in the deferred account were not actually a part of the cost of production under the CPFF contracts. Production tooling was commenced in 1939 and increased in volume as plaintiff received additional production contracts during 1940. Although plaintiff had received fixed-price contracts for approximately 1,600 planes by October 1940, only a small portion of deliveries were completed under these contracts by the end of 1940. Accordingly, it was proper for plaintiff to defer the tooling cost for the performance of these contracts and allocate such costs to deliveries in later years.

■ The CPFF contracts called for the same type of fighter plane for which the tooling had been provided in the performance of the fixed-price contracts. Thus, the tooling provided for the fixed-price contracts was utilized, with replacements from time to time, in the production of the same type of plane under the CPFF contracts. To the extent the performance under the CPFF contracts utilized the original tooling or replacements thereof, the original costs became properly applicable to performance under the CPFF contracts. Part of the original tooling became worn out or obsolete during production on fixed-price contracts and had to be replaced. The cost of replacing tools was charged currently to production on fixed-price contracts, so that when work was started on the CPFF contracts, the value of the original tooling was substantially the same as its original costs. Then, when these tools were scrapped due to a later change in model, the proceeds of the sale of such tools or scrap was credited entirely to the Government under the CPFF contracts. We conclude that a portion of the production tooling expense carried in the deferred account was properly a part of the cost of producing the planes under the CPFF contracts.

Next, the defendant says that if the Court should hold, as we do, that plaintiff's deferred experimental, development, and production tooling costs were actually a valid part of the cost of producing each item under both the fixed-price and the CPFF contracts, plaintiff still cannot recover because the Government did not in fact agree in the CPFF contracts that such costs would be reimbursed. Defendant bases this conclusion on the fact that until 1943 it had been plaintiff's intention to amortize *all* such costs over its fixed-price production contracts only and that plaintiff in fact did so; that it was not until the Bureau of Internal Revenue and the Re-negotiation authorities of the Government insisted that such an allocation improperly reduced plaintiff's actual profits on its fixed-price contracts; that plaintiff reallocated such deferred costs to all production, including production under its CPFF contracts; that these costs were not included in plaintiff's original negotiations for the CPFF contracts, but that they were included in plaintiff's bids on the fixed-price contracts; that reimbursement of this type would be contrary to the intentions of the contracting parties as shown by all the facts.

The intention of the contracting parties may become important and perhaps controlling in the interpretation of a contract where the language of that contract is ambiguous and not clear. In the instant case Article 3(b) of the CPFF contracts provided that allowable items of cost would be determined by the Contracting Officer in accordance with "Regulations for determination of the cost of performing a Contract as promulgated by the Treasury Department in Section 26.9 of Chapter 1 of Title 26 of Code of Federal Regulations, as contained in T. D. 5000 and approved by the Secretary of War August 2, 1940." Section 26.9(c) (5) (D) quoted both in Finding No. 19 and earlier in this opinion, provides that charges for depreciation of property used in the manufacturing process may be treated as an item of cost. The deferred charges for production tooling clearly fall within this category of factory costs. Section 26.9(d) also quoted in Finding No. 19 and earlier in this opinion, specifically provides that deferred experimental and development charges "upon a complete showing of all pertinent facts are properly to be included as a cost of performing the contract." There is nothing ambiguous about the language of the contract or T. D. 5000 regarding the treatment the parties agreed would be accorded to the charges in question. It appears to be defendant's position, however, that certain "pertinent facts" present in this case prevent the treatment of these charges as items of cost of performing the contract at least for the purposes of reimbursement.

There is no real dispute between the parties as to the existence of most of the "pertinent facts" relied on by the Government: that the costs were incurred several years prior to the entry into the cost-plus contracts; that in the course of the CPFF negotiations plaintiff had not intended to allocate any of such charges to production under the CPFF contracts and did not include any part of such charges in its costs estimates. What, then, is the significance of those facts on the question of plaintiff's right to reimbursement?

That the expenses were incurred several years prior to the entry into the CPFF contracts is, we think, immaterial, since the charges were incurred and properly deferred in the expectation that the experiments would lead to profitable production contracts for the manufacture and sale of articles to which the research and development would apply, and the CPFF contracts in question represented a portion of the fulfillment of that expectation. The production tooling, although used for production under the fixed-price contracts, was also used for the CPFF production and could not be used for producing other types of planes.

Plaintiff did not, at the time it was negotiating for the CPFF contract, intend to allocate any of its deferred experimental, development, and production tooling expenses to the CPFF contracts, and in its estimate of costs which it was required to make and present to the Government in negotiating the CPFF contracts, plaintiff did not include any amount to cover costs of this type. The contract itself provides for the consequences of such an omission from a contractor's cost estimates in Article 3(a) as follows: "The Government will pay the Contractor upon satisfactory delivery of all items specified in this contract, subject to reimbursements for cost, as outlined in Article . * * * hereof, the cost, plus a fixed fee of * * * Dollars and * * * cents * * * being * * * percent * * * of the total estimated cost of * * * Dollars * * *. This estimated cost and the fixed fee are subject to increases or decreases resulting from authorized changes as provided in Article * * * herein, provided, however, that there shall be no adjustment of the amount of the fixed fee as provided herein, nor shall there be any claim for increased compensation because of any errors and/or omissions made in computing the original estimated cost or where the estimated cost varies from the actual cost." Plaintiff omitted the items of expense in question from its estimated cost upon which its fixed fee was based and that omission would be a complete defense to a claim by plaintiff for an increase in its fixed fee. But plaintiff is not seeking an increase in its fixed fee and nothing in Article 3 indicates that a

legitimate item of cost may not be reimbursed merely because it was omitted from the original cost estimates.

The omission of these expenses from cost estimates was intentional on plaintiff's part and was apparently communicated to defendant. However, it has not been shown that defendant relied on plaintiff's intention not to request reimbursement and because of such reliance changed its position so as to work an estoppel. The record merely indicates that some agent of defendant had expressed the opinion to plaintiff, prior to the execution of the CPFF contracts, that experimental, development, and production tooling expenses would not be reimbursable, and that plaintiff accordingly decided not to request reimbursement. This understanding, if any, was not expressed in the contracts ultimately entered into, although it might easily have been done by expressly excluding such items in the contract. A similar situation existed in the Appeal of Nash-Kelvinator Corporation, NBCA 289, a case decided by the Navy Board of Contract Appeals on April 24, 1947. In that case the dispute involved the reimbursability of certain charitable contributions expressly made reimbursable under paragraph 40(f) of Explanation of Principles for Determination of Costs under Government Contracts, a document relative to costs similar to T. D. 5000, and incorporated by reference into the CPFF contract. On the basis of a departmental expense ruling and a decision of the Comptroller General, the Navy Department denied reimbursement. In holding for the contractor, the Board stated: "Had it been the intention of the Government to exclude contributions of the character described in paragraph 40(f) from allowable costs the obvious means of achieving such exclusion would have been the omission of paragraph 40(f) and the express exclusion of such expenses." See also Todd Shipyards v. United States, 93 F.Supp. 807, 117 Ct.Cl. 766.

As to defendant's contention that plaintiff had included all these deferred costs in its estimates used in bidding on the fixed-price production contracts, the Commissioner has found (Findings No. 12 and No. 41) and we have adopted his finding, that plaintiff did not include such costs in its bid estimates. At the time plaintiff was bidding on the fixed-price production contracts executed in 1939 and 1940 (Finding No. 9 for dates of execution of those contracts), only a portion of plaintiff's experimental and development costs had been determined and set up in the deferred account, and the production tooling expense involved herein had not yet been determined inasmuch as that expense grew largely out of the performance of those fixed-price production contracts. In any event, we do not believe that the inclusion or exclusion by plaintiff of these costs in its bid estimates would have any bearing on the issues of this case. It is our understanding that in making a bid, a fixed-price contractor usually tries to arrive at a price sufficiently low to secure the award, but high enough to secure a profit. In figuring a bid and in performing the contract, the cost problem as such, is one for the contractor. His contract protects him from increased costs clearly due to changed conditions or changes brought about by Government action, and the Government, in turn is protected from improper allocations of cost by the Renegotiation Act. Regardless of how much of the instant costs were actually included in the fixed-price bid estimates, plaintiff did attempt to allocate all of these costs when determined, to its fixed-price contracts, whereupon the Government proceeded, under the Renegotiation Act, to protect itself by disallowing a portion of the costs in the computation of plaintiff's profits for renegotiation purposes in 1942.[6]

We conclude that plaintiff's intention not to allocate any part of the costs in question to its CPFF contracts and its omission of such costs from the cost estimates submitted to defendant in negotiating such CPFF contracts, are not "conditions" or "pertinent facts" which make those costs nonreimbursable under the CPFF contracts. The actual omission is significant only for the purpose of comput-

6. The terms of the settlement agreement ultimately entered into by the parties, are discussed elsewhere in this decision.

ing plaintiff's fixed fee, and the amount of such fee is not involved herein. The contracts as entered into all expressly provided that such costs would be reimbursed. Plaintiff was under no contractual obligation to request reimbursement for any particular costs, but the contracts did obligate the Government to reimburse plaintiff for any costs made reimbursable by the contracts if, as here, reimbursement was requested.

In its defenses to the merits of plaintiff's claim, defendant makes the same argument urged earlier in the administrative defenses, that the contract and T. D. 5000 made the Contracting Officer's determination of allowable costs merely discretionary. We have already decided that the language of Article 3(b) imposes upon the Contracting Officer the obligation to determine whether or not costs are allowable under T. D. 5000. The use of the word "may" in the latter part of Section 26.9(d) of T. D. 5000 does not weaken that obligation as a reading of the whole section will demonstrate.

■ Defendant also contends that in order that deferred or capitalized experimental and development expenses be reimbursable as costs, they must have been amortized in accordance with a reasonably consistent plan. Defendant urges that plaintiff, in extending the amortization of the costs of experimental work over the production under CPFF contracts instead of confining such amortization to production under its fixed-price contracts as previously planned, had, in fact, two plans of amortization and that these plans were inconsistent. Plaintiff's basic plan of amortization (Finding No. 14) was to amortize these expenses over future production of products utilizing the designs and plans developed and this, in fact, is what plaintiff did. There was never any change in that basic plan. Both the Board of Contract Appeals and this Court have found that the amounts requested by plaintiff for reimbursement represented a proper proportion of such deferred expense determined by "a ratable allocation which is reasonable in consideration of the pertinent facts."

Defendant further contends that the charges in question are not allowable items of cost because T. D. 5000 contemplated reimbursement only of *"unliquidated* experimental and development charges." It is defendant's position that these charges were completely liquidated under plaintiff's first plan of amortization against the fixed-price contracts by the end of 1942. Section 26.9 (d) which describes "other manufacturing cost" properly includable as a cost of performing the contract, mentions "deferred" or "unliqudated" experimental and development charges. As an explanation of what is meant, the section states: "For example, in case experimental and development costs have been properly deferred or capitalized and are amortized in accordance with a reasonably consistent plan, a proper portion of the current charge, determined by a ratable allocation which is reasonable in consideration of the pertinent facts, may be treated as a cost of performing the contract or subcontract." At the time plaintiff presented its first vouchers for reimbursement of these charges, plaintiff had completely revised its books back to 1940, so that only that portion of its deferred charges ratably allocable to production under the fixed-price contracts had been amortized. The amount of experimental and development charges for which reimbursement was requested on the vouchers was still carried in the deferred account and met all the tests of Section 26.9(d). Neither the Bureau of Internal Revenue nor the Government Renegotiation Authorities considered these deferred charges actually or irrevocably "amortized" or "liquidated" by plaintiff's previous bookkeeping entries which had charged them all off to production under the fixed-price contracts. In their opinion, no amount of bookkeeping could alter the actualities of the situation, i. e., that these deferred charges were properly costs of every plane produced which utilized the designs, experimentation and production tooling represented by such charges. By the time plaintiff submitted its vouchers under the CPFF contracts, it had changed its bookkeeping to reflect the true state of affairs.

Our discussion above relates in part to another contention urged by defendant, namely, that to allow plaintiff to be reim-

bursed for the deferred charges properly allocable to production under the CPFF contracts, would in effect be to pay plaintiff twice for the same thing. This "double payment" argument seems to be based on the theory that because plaintiff made a profit on its fixed-price production contracts sufficient to cover all of the deferred charges, those charges were automatically written off or "liquidated". Plaintiff has pointed out exactly where such an argument could lead. For example, if plaintiff had, in fact, suffered losses on the fixed-price contracts, which losses exceeded in amount the total of the deferred charges, and plaintiff had elected to amortize none of those deferred charges over such fixed-price contracts, then, under defendant's theory, all of the deferred charges would be allowable items of cost reimbursable under the later CPFF contracts, since there had been no profits from the fixed-price contracts to affect the "liquidation" of those charges. It is obvious from the language of Section 26.9(d) of T. D. 5000 that such an allocation of all deferred charges to a CPFF contract where a portion of them represented the cost of producing items under other contracts, was not contemplated and would not have been permitted. Regardless of profit or loss resulting from production contracts, the deferred charges represented a portion of the cost of every plane produced under such contracts and plaintiff's revised books so treated the deferred charges.

Defendant suggests that the Government received nothing of value that it would not have received under the original conditions as they existed at the time the CPFF contracts were negotiated, and that plaintiff incurred no expense that it would not have incurred had no CPFF contracts been made by it with the Government. By the expression "under the conditions as they existed", defendant apparently is referring to the then state of plaintiff's bookkeeping which had allocated all of the deferred charges to the fixed-price contracts. As we have stated previously, a proper portion of those deferred charges were elements of cost of producing planes under the CPFF contracts regardless of plaintiff's books, and had the experiments not been conducted and the

charges not incurred, defendant could not have secured any of the planes from plaintiff. The fact that the expenses were incurred prior to the entry into the CPFF contracts does not prevent a portion of those expenses from being costs of manufacturing planes under those contracts, as T. D. 5000, Section 26.9(d) expressly provides. As for the deferred production tooling expenses which plaintiff had originally amortized against fixed-price contracts only, plaintiff's bookkeeping and its original intentions regarding amortization do not alter the fact that those production tools were used in producing the CPFF planes and a certain portion of those deferred charges were actually a part of the cost of such production.

 Finally, defendant says that if the Court should hold that the deferred charges in question constitute allowable items of cost under the CPFF contracts which should have been reimbursed, then only the excess costs in the sum of $229,986.30 which had been allocated by plaintiff to the experimental "Airacobra" contract should be charged off against subsequent P-39 production. Defendant urges that plaintiff has not shown that the balance of the deferred experimental and development charges, allocated to the Airacuda and the Airabonita experimental work were of benefit in the P-39 production.

As pointed out in our Finding No. 6, all excess costs on experimental contracts were classified as experimental and development expense and were accumulated from year to year during the performance of the several experimental contracts. No segregation of these costs was made as to their application to the specific contracts on which excess costs were incurred except the first amount deferred in 1938 which resulted from work on the experimental contract for the Airacobra. Plaintiff's auditors made an approximate allocation of this expense to the three experimental contracts by deducting from the costs of fulfilling each contract, the income received, and under that allocation (set out in Finding No. 6) the approximate allocation to the Airacobra was $229,986.30. Actually, no reasonably correct segregation of costs to any

particular experimental contract had been possible since the improvements in design and fabrication developed in .earlier operations were carried forward and applied on later experimental and development work on other models and finally into production contracts. The costs thus represented deferred values of designing and experience in fabrication rather than costs of any particular experimental airplane contract. In Finding No. 36 there are described some of the basic principles of design and fabrication which plaintiff developed on its experimental contract work and incorporated into the P–39 production models. Most of the developments, engineering standards and fabricating processes acquired during the performance of all three experimental contracts were incorporated and utilized in all subsequent production. The few developments not specifically utilized in the planes produced were of value because of the engineering knowledge gained that the particular design or development was not entirely satisfactory. The Commissioner

has found, and we have adopted his finding, that the true measure of the value of the experimental work on all three models to production of planes after 1940 is represented by the excess of costs on the experimental contracts over and above recoveries under these contracts in the net amount of $1,499,739.23, and that sum is thus the fair and reasonable value of the general experimental and development work in benefits and savings on the later production contracts.

Under the clear provisions of plaintiff's CPFF contracts and T. D. 5000, a portion of plaintiff's deferred experimental, development, and production tooling expenses were allowable items of cost and should have been reimbursed. The portion sought to be amortized against the CPFF contracts and claimed as allowable costs subject to reimbursement (Finding No. 41) represents a reasonable allocation of such costs on the basis of all production contracts. The sum so allocated is $2,286,819.95 and plaintiff may have judgment for that amount.[7]

7. The matter of plaintiff's taxes and the final renegotiation settlement have been the subject of considerable discussion in this case. Neither matter is directly in issue or has a real bearing on plaintiff's right of recovery. The Bureau of Internal Revenue has already applied plaintiff's costs in the manner plaintiff is contending for herein. However, since these costs were denied as reimbursable costs under the CPFF contracts, the Bureau allowed these costs, on a pro rata basis, as deductions from the net fees that the plaintiff realized on its CPFF contracts for deliveries of planes during 1943, 1944, and 1945 (Finding No. 33). Had these costs been reimbursed by the Government under the CPFF contracts, the Bureau would not have allowed such costs as deductions from the fees collected. Accordingly, plaintiff's recovery of these costs herein will become taxable since they were allowed as deductions during 1943, 1944 and 1945.

The Bureau of Internal Revenue also allocated part of these costs to deliveries in 1942 both on fixed-price and CPFF contracts. But the profits on the fixed-price contracts during 1942 were much greater, and the entire year was subject to renegotiation by the War Department (Finding No. 32). However, the Renegotiation Board calculated plaintiff's profits on the original basis of charges for experimental, development, and produc-

tion tooling costs amortized against plaintiff's fixed-price contracts only (Finding No. 16), disregarding the revision made by the Bureau of Internal Revenue. The amount of excess profits recouped by the Government was thus less than it would have been if these charges had been allocated to all planes delivered and deliverable under all contracts then in force. Plaintiff was required to refund $7,714,000 on the basis of total and excess profits so determined, but the agreement provided that if the pro rata allocation sought by plaintiff was carried through and allowed on all planes delivered under the CPFF contracts, the 1942 charges for experimental, development, and production tooling expenses against fixed-price contracts would be reduced to the extent of such reallocation, and the excess profits recoverable under the renegotiation would be increased by $667,000 which plaintiff agreed to pay to the Government, less whatever tax credit plaintiff might be entitled to by so refunding to the Government this amount as excessive profits for 1942. The remaining sum would then become subject to further tax. All actual amounts must be calculated by the General Accounting Office in its ultimate settlement with plaintiff and plaintiff's settlement with the Bureau of Internal Revenue.

It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

JONES, Chief Judge (dissenting in part).

I would disallow the second item of $986,963.93.

I agree that the Contracting Officer's decision was not necessarily final.

I would allow plaintiff to recover on the item which was paid and later recouped. This item had been approved by the Contracting Officer. Since it had been paid it manifestly had the approval of the other authorized officers of the Government. In the absence of fraud or mistake this should have been treated as final.

MADDEN, Judge (dissenting).

The War Department Board of Contract Appeals in its decision which is quoted in Finding 31 said: "Under these circumstances, it is difficult to understand how it can now be reasonably contended that an item of cost is reimbursable under the terms of the subject contracts, when, at the time the contracts were negotiated appellant did not intend that the item should be reimbursable * * *." The essence of this case is contained in the above statement. Is the plaintiff entitled to be paid $2,286,819.95 for something which, when it made the contracts under which it claims the payment, it intended that it should be paid nothing at all?

The plaintiff says that the contract, as written, calls for the payment, and that therefore it is entitled to it even though it did not count upon it or expect to get it, when it made the contracts. To bring about such a result, the contracts would have to speak in the plainest and most unmistakable language. But they did not do so. They spoke the language of T. D. 5000 which is quoted in Finding 19. In its paragraph (d) it says: "For example, in case experimental and development costs have been properly deferred or capitalized and are amortized in accordance with a reasonably consistent plan, a proper portion of the current charge, determined by a ratable allocation which is reasonable in consideration of the pertinent facts, may be treated as a cost of performing the contract or subcontract."

Before the cost-plus-fixed-fee contracts here in litigation were entered into, the plaintiff was following a method of amortization which would have completely written off these charges without attributing any of them to any future contract. After three of the four cost-plus-fixed-fee contracts were made, on August 14, 1941, September 10, 1941 and June 29, 1942, the plaintiff continued, down to the end of 1942, to pursue the same system of accounting, and by that time had completely amortized all of the costs claimed in this suit. On September 19, 1942, plaintiff's treasurer wrote plaintiff's comptroller that it would be improper accounting to charge any of these expenses against cost-plus-fixed-fee contracts since, to make them reimbursable costs under those contracts, such costs "would have to be included in the original negotiations of such contract. No provision is made for that on any of our cost-plus contracts in view of the position taken by the Government that prior to our entry into cost-plus contracts we have received sufficient fixed-price contracts to permit the amortization of deferred experimental expenses." See Finding 22.

This statement of course referred to the position taken by the Government at the time the contracts were entered into. It certainly did not refer to the position taken currently by the Bureau of Internal Revenue of the Government, which was exactly the opposite. See Finding 21. And there is nothing in the record tending to indicate that there had been any discussion between the plaintiff and the contracting officers of the Government between the time that the contracts were negotiated and the time of the above-quoted communication, with regard to what should or should not be reimbursable. Finding 15 shows that plaintiff set up its plan, limiting amortization to its fixed-price contracts because it understood that the charges here in question were not to be reimbursable under its cost-plus-fixed-fee contracts.

The quoted statement of the treasurer puts beyond question the intention of the

706

parties that the costs here sued for were not to be reimbursable. Their recovery is a complete and unexpected windfall of $2,286,819.95.

I have not failed to consider any equity in the plaintiff's favor which might arise from the fact that the change in the plaintiff's accounting method resulted from pressure which the Bureau of Internal Revenue put upon the plaintiff, in the Bureau's desire to establish a larger amount of excess profits made from the plaintiff's fixed-price contracts. As it turned out, the plaintiff's taxes for the years 1941 through 1945, during which it performed both the fixed-price and the cost-plus-fixed-fee contracts, were increased only $32,056.17 over what they would have been if they had been computed on the basis of the plaintiff's own method of accounting. As to the renegotiation of the plaintiff's contracts, the arrangement made was only tentative, and the plaintiff would not be prejudiced in that regard by an adverse judgment in this case.

The opinion of the Court accords finality to the Contracting Officer's approval of vouchers in the amount of $1,299,856.02, which were, accordingly, paid, and which are here in suit because that amount was subsequently recouped by the Government from amounts admittedly due the plaintiff under its contracts. I think the opinion of the Court is correct in not attributing to the plaintiff any failure to exhaust its administrative remedies in this regard. I think that the contract did not provide any administrative procedure which had to be followed, at the peril of losing a valid claim. But, on the other hand, I think that the provisions of Article 3(b) of the contract, quoted in Finding 19, that "allowable items of cost will be determined by the Contracting Officer * * *" did not confer upon that officer the powers of an agreed arbitrator such as are normally conferred upon that officer by Articles 4 and 15 of the usual Government contract. Article 3(b) says nothing about finality and I would not be willing to decide that a cost-plus-fixed-fee contractor who was entitled to be reimbursed for an expenditure could be irrevocably denied reimbursement because the contracting officer, acting under Article 3

(b), had refused to approve the expenditure for reimbursement because he construed the contract erroneously. If such a question arose, and the contractor was dissatisfied with the amount paid him, I think he would have the right to establish his claim in this or some other competent court, without being prejudiced by an administrative decision which the court thought was wrong. For the same reason I think that the Government was not foreclosed by the erroneous decision of its Contracting Officer. He had no more power to give the plaintiff $1,299,856.02 which it had not contracted for than he would have had to deny the plaintiff that sum if it had been entitled to it under its contract.

I would dismiss the plaintiff's petition.